J-S56022-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                       : PENNSYLVANIA
                                       :
            v.                       :
                                       :
                                       :
WILLIAM SANCHEZ,             :
                                       :
             Appellant.           : No. 1880 MDA 2017

Appeal from the Judgment of Sentence, October 6, 2017,
in the Court of Common Pleas of Dauphin County,
Criminal Division at No(s): CP-22-CR-0005344-2015.

BEFORE: GANTMAN, P.J., KUNSELMAN, J., and MUSMANNO, J.

MEMORANDUM BY KUNSELMAN, J.:         **FILED DECEMBER 18, 2018**

William Sanchez appeals from the judgment of sentence after a jury found him guilty of first degree murder of Jorge Toro and resisting arrest. After careful review, we affirm.

The trial court provided a detailed account of the facts as follows:

> In August 2015, Sadi Figueroa was romantically involved with Jorge Toro, nicknamed "Pikachu." Toro's heroin use, which frequently caused him to become sick when he needed drugs, was a source of arguments between them. Occasionally, Ms. Figueroa rode in the car with Toro to Hall Manor where he would meet [Sanchez]. Toro often left their apartment for Hall Manor, sick from withdrawal, then returned not sick.
>
> On August 17, 2015, at 6:00 a.m., the phone Ms. Figueroa lent to Toro rang repeatedly. Toro was very drug sick that day. When Ms. Figueroa spoke to him on the phone that afternoon, Toro stated, "I am resolving an issue". When Toro returned to the apartment, he appeared frantic and told her that a person "had him here and there." When Toro received a call late in the day,

Ms. Figueroa heard him say something to the effect of, "It's him." Toro left without saying where he was going.

Jennifer Jancewicz, was, at the time, an admitted heroin addict. Throughout the day, she desperately attempted to reach her supplier Jorge Toro. That evening, Ms. Jancewicz became ill and anxious, in need of heroin. Toro did not respond to her dozens of text messages. Police contacted Jancewicz early on the morning of August 18, 2017 having retrieved her number from Toro's phone.

Emily Osorio lived with her husband Luis Osorio ("Osorio") and their four daughters in an apartment in Hall Manor, near [Sanchez's] residence. Osorio frequently visited [Sanchez] and returned with heroin. Osorio became extremely sick if he did not have the heroin he needed. Jorge Toro and Osorio frequently shared heroin if they did not have enough money to buy drugs individually. As of August 2015, Osorio's addiction had progressed significantly. He and Toro were high every time Emily Osorio saw them together.

Early in the morning on August 17, 2015, [Sanchez] called Osorio and accused him of breaking into his van, which Osorio denied. Emily Osorio saw her husband across the street talking to [Sanchez]. [Sanchez] then claimed that Toro broke into the van and stole a gun that Toro sold [Sanchez] a few days earlier.

After taking her children to school, Emily walked up to the van and saw that the driver's side window was broken. At approximately noon, Emily saw [Sanchez] and her husband speaking to Toro. [Sanchez] and Osorio began driving around. As they drove, [Sanchez] placed a semiautomatic gun on his thigh and told Osorio he was going to "check Pikachu out." [Sanchez] called Toro, but did not reach him. [Sanchez] made threats about Toro. Unable to reach Toro, [Sanchez] returned to Hall Manor. [Sanchez] remained angry, believing that Toro broke into the van.

Erving Marrero-Machado, ("Marrero") nicknamed "Cholon" knew [Sanchez] because their wives were friends. Marrero saw [Sanchez] that evening vacuuming broken glass from his car. [Sanchez] was angry and mentioned the name Pikachu. Marrero drove to Hall Manor in his vehicle where he picked up [Sanchez]. Marrero tried to calm [Sanchez] by driving around. The two picked up Osorio. [Sanchez] sat in the front passenger seat and Osorio

in the back seat. Marrero drove to the area of Dean and Rollerston Streets, where he parked his car. Toro's vehicle was parked nearby. [Sanchez], Osorio and Morrero exited the vehicle.

[Sanchez] began to argue with Toro about the van. [Sanchez] pulled out a gun. Osorio heard some "pops" and a scream. Marrero and Osorio ran away. Osorio ran back toward his house via the route Morrero had driven in the car. Morrero ran to a nearby grocery store before returning to the alleyway to retrieve his car. When Morrero spoke to [Sanchez], [Sanchez] said "he got what he was looking for."

[Sanchez] and Morrero found Osorio behind a nearby school. [Sanchez] stated, "I caught him in the stomach, he screamed like a bitch" then "came over and put two in his head." [Sanchez] gave the gun to Morrero and told him to "get rid of this."

At 9:50 p.m., Emily received a text from Osorio which told her to turn on the news. Within minutes, Osorio banged on their front door. Osorio appeared panicked. He ran to the sink, began washing his face, arms and upper body and said, "He shot him." When Emily Osorio asked who, Osorio responded "Will." Osorio stated, "He killed him. He shot him here, in the stomach." Osorio gestured to the groin area. He told Emily that after [Sanchez] shot Toro in the groin, Toro fell and asked, "What's going on? You know. Let's talk about it. Let's talk it out." Osorio stated that [Sanchez] said to Toro in Spanish, "Fuck you," and shot him in the head. Frightened, Emily told Osorio to leave the house.

That night, Rose Caraballo Santana drove through an alleyway near Rollerston and Dean Streets in Harrisburg toward her mother's house. At first, Ms. Santana thought the person she saw lying in the alleyway was intoxicated. Frightened when she observed blood, Ms. Santana called police. Police interviewed Ms. Santana's stepfather, Samuel Ramos, who lived near the alleyway. Mr. Ramos told police he had heard five to six gunshots approximately half an hour before police arrived.

Harrisburg Police Corporal Brian Henry and another officer arrived to the area of Dean Street behind the 1300 Block of Rollerston Street at approximately 9:55 p.m. Emergency personnel were on the scene when he arrived. Corporal Henry observed that the victim was obviously deceased, with a gunshot

wound to the back of the head and blood on his pelvic area and buttocks.

Police located five shell casings near the body. On the victim's body, police found syringes, empty baggies and a little over nine dollars in cash. The baggies were torn open and appeared to have contained residue of heroin. Police located Jorge Toro's vehicle nearby.

At around 11:00 p.m., Sadi Figueroa called Toro's phone to find out where he was. Harrisburg Police Captain Gabriel Olivero, who had responded to the scene, answered the ringing phone. Captain Oliverio asked Ms. Figueroa identifying information about Toro's clothing and vehicle. Police informed Ms. Figueroa that Toro was deceased.

Over the ensuing days, Emily Osorio became increasingly anxious. She decided to contact a Swatara Township police officer with whom Osorio had previous contact related to a theft charge. Emily identified [Sanchez] in a photo array as the person who Osorio identified as the shooter. A few days after Emily spoke to police, someone spray-painted the words "Two rats live here" on the front and back of their apartment.

In late August 2015, Police contacted Luis Osorio. Osorio first denied knowledge of the shooting. In a second statement, Osorio claimed that he remained in the car as [Sanchez] shot Toro. In a September 1, 2015, statement, Osorio admitted being in the alleyway when [Sanchez] shot Toro. Osorio testified that initially he gave incorrect statements out of fear of being known as a snitch, because his wife and children lived across the street from [Sanchez].

After speaking with Osorio and Marrero, police took [Sanchez] into custody on September 1, 2015.

In September 2015, while awaiting sentencing on federal drug charges, Nelson Martinez shared a cell with [Sanchez] at the Dauphin County Prison. Martinez heard [Sanchez] cry during the night. [Sanchez] and Martinez conversed in Spanish. [Sanchez] told Martinez that he killed Pikachu because Pikachu sold him a gun then stole it from him. [Sanchez] told Martinez that he knew that Toro needed drugs early in the day, but did not meet with Toro until night time. [Sanchez] told Martinez that Toro arrived at

- 4 -

the location, hurriedly asked for the drugs and paid [Sanchez]. [Sanchez] told Martinez that he acted as if he were reaching for the drugs, but pulled out a gun. [Sanchez] related that he confronted Toro about stealing the gun and asked, "Why did you do that to me?" [Sanchez] told Martinez that after Toro laughed at him, he shot him once in the stomach and twice in the head. [Sanchez] told Martinez that the two people with him hid in the bushes during the shooting, then fled. [Sanchez] stated that when he got home, he washed his arms with tomato sauce which he believed would eliminate evidence of gun powder.

Trooper Todd Neumeyer, a firearms and tool mark examiner with the Pennsylvania State Police, opined that the five shell casings retrieved from the scene were all fired from the same gun.

Forensic pathologist, Wayne Ross, M.D., testified that Jorge Toro died of multiple gunshot wounds: one behind his right ear, to the left cheek, to his right arm and to the lower right quadrant of the abdomen. All shots were fired from a distance of 3-4 feet or greater. Dr. Ross testified that the gunshot to the abdomen, which entered from front to back, would have caused Toro to drop. The gunshot wound to the left cheek exhibited a projectile path of 45 to 60 degrees downward, consistent with a person standing over the victim while shooting. Dr. Ross testified that the gunshot to the left cheek entered the airways in the neck and caused substantial bleeding into the lungs, which would have killed Jorge Toro. The gunshot wound to the brain exhibited the path of a large caliber missile which also entered from front to back. The autopsy also revealed track marks in the inside crease of the elbow evidenced Jorge Toro's drug abuse.

Trial Court Opinion, issued 4/15/18, 2-7.

A jury trial was held on October 3-6, 2017. Prior to trial, Sanchez interposed an oral motion *in limine* to exclude prior bad acts evidence under Pennsylvania Rule of Evidence 404(b). The trial court denied the motion. The jury convicted Sanchez of the above charges. The court sentenced Sanchez to life without parole. Sanchez filed a post-sentence motion, which the trial

court denied on November 16, 2017. This timely appeal followed. Both Sanchez and the trial court have complied with Pa.R.A.P. 1925.

Sanchez raises two issues on appeal:

1. Did not the lower court err in denying [Sanchez]'s motion *in limine* to bar the introduction of prior-bad-act evidence detailing [Sanchez's] activity as a drug dealer in general and more particularly as the principal seller of heroin to the decedent?

2. Did not the lower court abuse its discretion by failing to grant [Sanchez] a new trial on the basis that the guilty verdict was against the weight of the evidence when the totality of the evidence was unreliable, contradictory, and incredible?

Sanchez's Brief at 6.

Sanchez first argues that "the evidence of [him] selling heroin to the decedent and others was irrelevant and inadmissible as 'bad act' evidence under Pa.R.E. 404(b)," and that, "any minimal relevance of such evidence was outweighed by the undue prejudice occasioned by its admission." *Id*. at 26.

Our standard of review of the denial or grant of a motion *in limine* is well settled:

> When ruling on a trial court's decision to grant or deny a motion *in limine*, we apply an evidentiary abuse of discretion standard of review. The admission of evidence is committed to the sound discretion of the trial court, and a trial court's ruling regarding the admission of evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous.

*Commonwealth v. Ivy*, 146 A.3d 241, 250 (Pa. Super. 2016) (citation omitted). "Evidence is admissible if it is relevant – that is, if it makes a fact at issue more or less probable, or supports a reasonable inference supporting a material fact." *Commonwealth v. Wynn*, 850 A.2d 730, 733 (Pa. Super. 2004).

The Pennsylvania Rules of Evidence generally prohibit evidence of bad acts "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). This rule against the admission of bad acts is subject to numerous exceptions. The Rules themselves provide that a defendant's prior bad acts may be introduced to demonstrate motive, opportunity, intent, preparation, plan, knowledge, identity, an absence of mistake or accident. Pa.R.E. 404(b)(2). As we previously held, this list is non-exclusive. *Commonwealth v. Reese*, 31 A.3d 708, 723 (Pa. Super. 2011) (*en banc*). Our Supreme Court "has demonstrated it will recognize additional exceptions to the general rule where the probative value of the evidence outweighs the tendency to prejudice the jury." *Id.*

For example, "our Supreme Court has consistently recognized that admission of distinct crimes may be proper where it is part of the history or natural development of the case." *Commonwealth v. Brown*, 52 A.3d 320, 326 (Pa. Super. 2012) (citations omitted). This common-law "*res gestae*" exception, as our Supreme Court described, " is also known as the "complete story" rationale, i.e., evidence of other criminal acts is admissible to complete

the story of the crime on trial by proving its immediate context of happenings in time and place." ***Commonwealth v. Lark***, 543 A.2d 491, 497 (Pa. 1988).

Here, the trial court allowed the admission of Sanchez's drug dealing under the *res gestae*, or "part of the story," exception. Where the *res gestae* exception applies, the trial court must balance the probative value of evidence against its prejudicial impact. ***Commonwealth v. Sherwood***, 982 A.2d 483, 497 (Pa. 2009).

As Sanchez notes, the Commonwealth claimed at trial "that it was necessary to introduce evidence of [Sanchez's] drug dealing to explain (1) how [Sanchez and Toro] knew each other; and (2) why [Toro] would have agreed to meet [Sanchez] in an alleyway after dark on August 17, 2015. Sanchez's Brief at 34.

In this appeal, Sanchez challenges this reasoning. He argues that the drug dealing evidence was not relevant. ***Id.*** at 34-36. He claims the existence of the ongoing relationship between him and Toro could have been established without mentioning any drug dealing or drug use. ***Id.***

In allowing this testimony, the trial court reasoned:

> Here, Jancewicz' testimony of her heroin addiction and desperate attempts to contact her supplier, Jorge Toro, constituted a relevant part of the complete story as to why Toro met with [Sanchez], also a heroin supplier, on the night of the shooting. The probative value of such evidence outweighed its potential for prejudice. Even if potentially prejudicial, no harm occurred by introduction of Jancewicz' testimony in that the record was replete with other evidence of the drug culture out of which the killing arose.

Trial Court Opinion, 4/5/18, at 9.

We agree with the Commonwealth and the trial court that the evidence of Sanchez's prior drug transactions established part of the "history of the case" and formed part of the natural development of facts. The trial court did not admit such evidence for the purpose of demonstrating Sanchez had a propensity to distribute heroin. The trial court admitted the evidence so the Commonwealth could show a sequence of events, which explained how the two men were connected and why Sanchez and Toro met in the alleyway on the night in question. The context of the relationship between the Sanchez and the decedent was important for the jury to understand the whole story in terms of time and place, and on balance was more probative than prejudicial. Accordingly, we discern no error or abuse of discretion by the trial court in admitting this evidence.

Sanchez next challenges the weight of the evidence supporting his jury verdict of first degree murder. Appellate review of a weight of the evidence claim involves "examining the trial court's exercise of discretion in its review of the fact-finder's determinations." ***Commonwealth v. Ross***, 856 A.2d 93, 99 (Pa. Super. 2004). As this Court has summarized:

> The determination of the weight of the evidence exclusively is within the province of the fact-finder, who may believe all, part, or none of the evidence. A new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. In this regard, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court.

***Id.*** (citations omitted).

The trial court found no merit to Sanchez's weight claim and reasoned:

> . . . we correctly concluded that the weight of the evidence supports the jury's finding that [Sanchez] killed Jorge Toro. The jury was free to reconcile, as it deemed appropriate, discrepancies in the testimony of Osorio and Marrero, or, in the alternative, fully accept the testimony of Nelson Martinez, to whom [Sanchez] gave a detailed confession.
>
> We also properly rejected [Sanchez's] claim that a lack of physical evidence linking [Sanchez] to the scene undermines the weight of the evidence. Circumstantial evidence may prove guilt beyond a reasonable doubt.

Trial Court Opinion, 4/5/18, at 10. We agree.

In reaching their verdict, the jury clearly believed the evidence that the Commonwealth offered to establish Sanchez's guilt. Because the evidence presented was not "tenuous, vague and uncertain," the trial court did not abuse its discretion in denying Sanchez's post-sentence motion for a new trial. *See Ross*, 856 A.2d at 99. Thus, Sanchez's weight claim is without merit.

In sum, the trial court properly admitted evidence of Sanchez's prior heroin dealing, and this evidence, along with the testimony presented by the Commonwealth, demonstrates that Sanchez's conviction was supported by the weight of the evidence. We therefore affirm Sanchez's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>12/18/2018</u>