J-S35015-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CARLOS MARTINEZ-DIAZ | : | |
| | : | |
| Appellant | : | No. 371 MDA 2021 |

Appeal from the Judgment of Sentence Entered June 8, 2018
In the Court of Common Pleas of Berks County Criminal Division at
No(s): CP-06-CR-0005162-2017

BEFORE:   OLSON, J., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY OLSON, J.:                    **FILED:  APRIL 11, 2022**

Appellant, Carlos Martinez-Diaz, appeals from the judgment of sentence entered on June 8, 2018 in the Criminal Division of the Court of Common Pleas of Berks County, as made final by the denial of his initial post-sentence motion on December 22, 2020, together with the denial of his supplemental post-sentence motion on February 16, 2021.  We affirm.

In its opinion filed pursuant to Pa.R.A.P. 1925(a), the trial court prepared a thorough summary of the historical facts established at trial in this case.  ***See*** Trial Court Opinion, 5/19/21, at 3-19.  We adopt the trial court's recitation of these facts and incorporate it herein as if set forth at length.

At the conclusion of trial on June 7, 2018, a jury found Appellant guilty of two counts of corrupt organizations (18 Pa.C.S.A. § 911(b)(2) and (b)(3)),

_____

[*] Retired Senior Judge assigned to the Superior Court.

one count of criminal use of a communication facility (18 Pa.C.S.A. § 7512(a)), two counts of conspiracy (18 Pa.C.S.A. 903(a)(1)), and six counts of delivery of a controlled substance (35 P.S. § 780-113(a)(30)). On June 8, 2018, the trial court ordered Appellant to serve 18½ to 60 years' imprisonment in a state correctional facility.

Thereafter, Appellant filed a *pro se* post-sentence motion on June 20, 2018. The trial court, however, did not adjudicate this submission, as counsel was still attached to the case. ***See Commonwealth v. Ellis***, 626 A.2d 1137, 1139 (Pa. 1993) ("[T]here is no right to hybrid representation either at trial or on appeal."). Appellant's sentence was thereafter amended on June 25, 2018 to include additional credit for time served before sentencing. Appellant's sentence was again amended on August 21, 2018 to reduce his maximum sentence by 10 years and to impose a new aggregate sentence of 18½ to 50 years. Appellant filed a *pro se* notice of appeal on November 9, 2018, which this Court quashed on June 6, 2019 as untimely.

While the untimely appeal remained pending before this Court, Appellant, on June 3, 2019, filed a petition for collateral relief pursuant to the Post-Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546. The PCRA court appointed counsel, who filed an amended petition on October 22, 2019, after this Court quashed Appellant's untimely appeal. The petition alleged that trial counsel was ineffective in failing to file a direct appeal and requested reinstatement of Appellant's post-sentence and direct appeal rights. After a hearing, the PCRA court denied the petition on January 29, 2020. Appellant

appealed the dismissal of his collateral relief claims and, on November 30, 2020, this Court reinstated his rights to file post-sentence motions and pursue a direct appeal.

With the assistance of new counsel, Appellant filed a post-sentence motion on December 18, 2020. The trial court denied the motion on December 22, 2020 but gave Appellant 45 days to file a supplemental post-sentence motion. Appellant filed a supplemental post-sentence motion on February 5, 2021, which was denied on February 16, 2021. Appellant filed a notice of appeal on March 22, 2021[1] and, after extension, a concise statement of errors pursuant to Pa.R.A.P. 1925(b) on April 19, 2021. The trial court issued its Rule 1925(a) opinion on May 19, 2021.

Appellant's brief raises the following issues for our review.

> [Did the trial court err] and abuse its discretion in overruling Appellant's objection to the introduction of documents with statements attributed to Appellant without presenting any direct witness to the alleged statements?

---

[1] The trial court docketed Appellant's March 22, 2021 notice of appeal on the 30th day following service of the order denying Appellant's supplemental post-sentence motion (February 18, 2021). Hence, we shall treat this appeal as timely filed. **See** Pa.R.A.P. 903(a) ("notice[s] of appeal ... shall be filed within 30 days after the entry of the order from which the appeal is taken"); Pa.R.A.P. 108(a) and (d) (where a post-sentence motion has been filed in a criminal case, any period of time computed under the appellate rules involving the date of entry of an order by a court or other government unit, the day of entry shall be the day the clerk of the court or the office of the government unit mails or delivers copies of the order to the parties); Pa.R.Crim.P. 720 (A)(2)(a) (notice of appeal is due within 30 days of order denying timely post-sentence motion).

[Did the trial court] abuse its discretion at sentencing where the sentencing court relied on improper factors to justify an aggregate sentence that is tantamount to a life sentence and [where the court failed to] consider [Appellant's] rehabilitative needs?

Appellant's Brief at 4.

In his first issue, Appellant argues that the admission of two exhibits offered by the Commonwealth to connect him to a telephone number used to make and/or forward incriminating calls and text messages violated his right to cross-examine the witnesses against him under the Confrontation Clause of the Sixth Amendment to the United States Constitution.[2]  *See* U.S. Const.

---

[2] Commonwealth's Exhibit 83 ("Exhibit 83") consists of Appellant's arraignment information sheet, which was completed following an exchange between Appellant and a magistrate district judge during Appellant's preliminary arraignment.  *See* N.T. Trial, 6/5/18, at 9-14.  The Commonwealth presented Exhibit 83 at trial without witness testimony pertaining to its creation after the trial court agreed, at the Commonwealth's request, to take judicial notice of the document.  *See id.* at 11;  *see also* Trial Court Opinion, 5/19/21, at 26-28, *citing* Pa.R.E. 201(b)(2) (permitting judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

Commonwealth's Exhibit 86 ("Exhibit 86") consists of Appellant's prisoner information report, which attributed a telephone number targeted during the relevant police investigation to Appellant.  *See* N.T. Trial, 6/7/18, at 285 and 400.  At trial, the Commonwealth presented the testimony of Michael Mullen, a supervisor of pretrial services at Berks County Prison, to address the nature of the information included within an inmate information report, the process by which such reports are prepared, and confirmation that information used to prepare such reports comes from inmates directly.  *See id.* at 283.  Mullen neither prepared nor reviewed Appellant's intake report but stated that Edward Hartzell, a correctional officer at Berks County Prison, created Appellant's prisoner intake form.  *See id.* at 401.  Hartzell was not available to testify at Appellant's trial and there is no indication in the certified record that defense counsel had an opportunity to cross-examine Hartzell.

- 4 -

amend. VI ("In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him"). Appellant asserts that the Confrontation clause barred admission of Exhibits 83 and 86 since the individuals who prepared those documents were not made available at trial and because he had no prior opportunity to cross-examine them. *See* Appellant's Brief at 19. Appellant also claims that the primary purpose of the challenged exhibits is to establish facts relevant to prosecution since the documents were created under circumstances that would lead a neutral witness reasonably to conclude that the materials would be available for use at a later trial. *See id*., *quoting* **Commonwealth v. Brown**, 139 A.3d 208, 212 (Pa. Super. 2016). Appellant observes that the challenged exhibits constituted testimonial statements since "it is common practice for prosecutors to use preliminary arraignment and other such paperwork to establish a criminal defendant's contact information where such information is potentially incriminating." Appellant's Brief at 19-20. We conclude that this claim merits no relief.[3]

_____

[3] Both the trial court and the Commonwealth contend that Appellant waived appellate review of his challenge to Exhibits 83 and 86 since he articulated different objections at trial. **See** Trial Court Opinion, 5/19/21, at 44; Commonwealth's Brief at 14-15. After careful review of the certified record, we disagree. While it is correct that defense counsel offered several reasons to reject admission of Exhibits 83 and 86, he relied heavily, if not primarily, upon the claim that these materials were unreliable in linking Appellant to the targeted telephone number, a contention in which he emphasized the need to confront the creators of the respective forms. **See e.g.** N.T. Trial, 6/5/18, at
*(Footnote Continued Next Page)*

We ordinarily review a trial court's evidentiary rulings for an abuse of discretion; however, whether the admission of evidence violates an appellant's rights under the Confrontation Clause is a question of law subject to our plenary, *de novo* review. ***In re N.C.***, 105 A.3d 1199, 1210 (Pa. 2014); ***Commonwealth v. Cheng Jie Lu***, 223 A.3d 260, 264 (Pa. Super. 2019); ***Commonwealth v. Williams***, 103 A.3d 354, 358 (Pa. Super. 2014).

The Confrontation Clause bars admission of out-of-court testimonial statements of an unavailable witness when the defendant has not had an opportunity for cross-examination. ***Michigan v. Bryant***, 562 U.S. 344, 354 (2011); ***Davis v. Washington***, 547 U.S. 813, 821 (2006); ***Commonwealth v. Allshouse***, 36 A.3d 163, 171 (Pa. 2012); ***Cheng Jie Lu***, 223 A.3d at 264. The preclusive sweep of the Confrontation Clause extends only to testimonial statements and does not prohibit out-of-court statements which are nontestimonial. ***Bryant***, 562 U.S. at 354; ***Davis***, 547 U.S. at 821; ***Allshouse***, 36 A.3d at 173.

---

11 (defense counsel asking whether Commonwealth would subpoena magistrate who prepared Appellant's arraignment information form); ***see also id***. at 400-401 (noting that correctional officer who performed Appellant's prison intake interview would not be available for defense examination). While it would be preferable if counsel had expressly invoked the Confrontation Clause when he raised his evidentiary objections, it is evident that he placed the need to examine the declarants before the trial court for its consideration. Under these circumstances, we conclude that Appellant adequately preserved his claim for appellate review.

The law in Pennsylvania is reasonably clear that statements are nontestimonial when made during police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable the police to meet an ongoing emergency. *See Allshouse*, 36 A.3d at 172, *quoting Davis*, 547 U.S. at 822. Statements are deemed testimonial, however, when circumstances objectively indicate that no ongoing emergency exists and that the primary purpose of interrogation is to prove or disprove past events with potential relevance to subsequent criminal prosecution. *See Allshouse*, 36 A.3d at 172, *quoting Davis*, 547 U.S. at 822.

In considering the testimonial nature of a statement, the foregoing decisions (and much, if not all, of Pennsylvania appellate case law addressing the Confrontation Clause) focus upon police interrogation, the primary purpose of such interrogations, and whether an ongoing public safety emergency exists. These precedents do not consider whether prison intake forms, and similar administrative materials such as preliminary arraignment forms, fall within the category of nontestimonial statements. In addition, our own research efforts have been unsuccessful in locating Pennsylvania appellate authority relevant to the precise issue before us.

Nevertheless, at least one federal district court has considered and rejected the claim that admission of administrative materials like prison intake forms violates a criminal defendant's rights under the Confrontation Clause. That court offered the following rationale for its conclusion.

- 7 -

In **Crawford v. Washington**, 541 U.S. 36, 68 (2004), the [United States] Supreme Court reiterated that[,] "[w]here testimonial evidence is at issue ..., the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." As such, a Confrontation Clause violation occurs where a court allows the admission of "testimonial" statements against a criminal defendant who did not have an opportunity to cross-examine the witness. **Id.** The [United States] Supreme Court in **Crawford** did not, however, give lower courts a precise definition of the term "testimonial." **See Crawford**, 541 U.S. at 68. According to **Crawford**, in its broadest formulation, testimonial statements are "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." **Crawford**, 541 U.S. at 52 (quotation marks and citation omitted).

Since **Crawford**, the United States Supreme Court has continually refined and clarified the meaning of "testimonial," but the [] Court has never specifically addressed the situation presented by [defendant's claim that the admission of a prison intake form violated his rights under the Confrontation Clause]. In **Melendez–Diaz v. Massachusetts**, [557 U.S. 305 (2009)] the [Court] concluded that forensic lab certificates are testimonial for the purpose of **Crawford**, but nonetheless emphasized the following:

Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because - having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial - they are not testimonial.

**Needham v. Whitener**, No. 5:13-cv-104-FDW, 2013 WL 5636746, *5-6 (W.D.N.C. Oct. 15, 2013), *quoting* **Melendez–Diaz**, 557 U.S. at 324.

We conclude that the content of Exhibits 83 and 86 were not "testimonial" under **Crawford**'s general definition of that term, as both the arraignment information form and the prisoner information form were created

for routine administrative purposes, *i.e.*, the collection of contact information and the acquisition of prison census and identification data. These administrative materials, which appear to have been created in the ordinary course of administration by a magistrate judge and a correctional officer, were not created by investigative law enforcement personnel in anticipation of later use at a criminal trial to prove or disprove facts. **Compare Melendez-Diaz**, 557 U.S. at 309-311 (forensic lab certificates fell within core class of testimonial statements covered by the Confrontation Clause since they were essentially synonymous with affidavits, created for the sole purpose of establishing the composition, quality, and net weight of a submitted drug sample, and, as such, prepared under circumstances which would lead an objective witness reasonably to believe that the certificates would be available for use at a later trial). Moreover, we reach this conclusion despite the Commonwealth's use of Exhibits 83 and 86 to connect Appellant to a targeted telephone number at trial since **Crawford**'s definition of "testimonial" turns more so on the **anticipated** use and **primary** purpose of a particular statement, not the ultimate or actual use to which the statement is put.[4]

---

[4] Our decision to treat routine, biographical forms prepared for administrative purposes as nontestimonial statements receives support from appellate cases that address the scope of the Fifth Amendment's right against self-incrimination and conclude that biographical inquiries are not ordinarily undertaken with the expectation that they will elicit incriminating responses. Pursuant to **Miranda v. Arizona**, 384 U.S. 436 (1966), a criminal defendant is entitled to a recitation of his rights against self-incrimination prior to

*(Footnote Continued Next Page)*

Because Exhibits 83 and 86 do not trigger Confrontation Clause protections under the circumstances in this case, we hold that Appellant is not entitled to relief.

In his second claim, Appellant forwards a challenge to the discretionary aspects of his sentence, arguing that the trial court abused its discretion in considering improper factors, failing to consider Appellant's rehabilitative needs and mitigating factors, and imposing an excessive aggregate punishment. This claim is devoid of merit.

We have carefully reviewed the certified record, the submissions of the parties, and the thorough discussion of Appellant's discretionary sentencing challenge authored by the trial court. We are satisfied that the trial court has

---

custodial interrogation. Nevertheless, while statements obtained in violation of *Miranda* are subject to suppression, a statement uttered in a custodial setting is not suppressed when it constitutes a response to biographical questioning. *See Commonwealth v. Garvin*, 50 A.3d 694, 698 (Pa. Super. 2012). "Generally speaking,[] information such as name, height, weight, residence, occupation, *etc*. is not the kind of information which requires *Miranda* warnings since it is not information generally considered as part of an interrogation." *Garvin*, 50 A.3d at 698, *quoting* *Commonwealth v. Jasper*, 587 A.2d 705, 708–709 (Pa. 1991). Such questions are not "calculated to, expected to, or likely to elicit an incriminating response, or ... asked with [the] intent to extract or an expectation of eliciting an incriminating [response]." *Garvin*, 50 A.3d at 698 (citations omitted). Moreover, we have held that there is no requirement that a suspect be given *Miranda* warnings where the police seek only biographical, general information for completion of prison intake forms. *See Garvin*, 50 A.3d at 699, *citing* *Commonwealth v. Friedman*, 602 A.2d 371, 378 (Pa. Super. 1992). Because biographical intake materials such as Exhibits 83 and 86 are generated for administrative purposes, and are not calculated to elicit incriminating responses, they are not made under circumstances which would lead an objective witness reasonably to believe that the materials would be available for use at a later trial.

adequately and accurately addressed each of the claims raised by Appellant. As such, we reject Appellant's discretionary sentencing claim for the reasons set forth by the trial court and adopt is rationale as our own. **See** Trial Court Opinion, 5/19/21, at 30-40. Since we have adopted a portion of the trial court's opinion as our own, we direct the parties to attach a copy of the trial court's opinion to all future filings pertaining to the disposition of this appeal.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 04/11/2022

COMMONWEALTH OF PENNSYLVANIA   :   IN THE COURT OF COMMON PLEAS
      :   OF BERKS COUNTY, PENNSYLVANIA
      :   CRIMINAL DIVISION
          VS.       :

      :   No. CP-06-CR-5162-2017

      :

CARLOS MARTINEZ-DIAZ       :   Assigned to: Judge M. Theresa Johnson

Edward C. Meehan, Jr., Esquire
*Attorney for Appellant*

Alisa R. Hobart, Esquire
*Attorney for the Commonwealth/Appellee*

| Memorandum Opinion | May 19, 2021 | M. Theresa Johnson, J. |

## PROCEDURAL HISTORY

The defendant in the above-captioned case, Carlos Martinez-Diaz ("Diaz"), was charged with various drug-related offenses arising out of incidents alleged to have occurred between May 31, 2017, and August 2, 2017. On June 7, 2018, a jury found Diaz guilty of two counts of corrupt organizations,[1] one count of criminal use of communication facility,[2] two counts of conspiracy to commit delivery of a controlled substance[3] and six counts of delivery of a controlled substance.[4] On June 8, 2018, Diaz was ordered to serve an aggregate sentence of 18½ years to 60 years in a state correctional facility. On June 20, 2018, Diaz filed a *pro se* post-sentence motion which this court declined to address as Diaz was represented by counsel.[5] On June 25, 2018, Diaz's sentence was amended to include credit for the 124 days he had previously served which was mistakenly omitted from the original sentencing orders. On August 21, 2018, Diaz's sentences on two counts

---

[1] 18 Pa.C.S.A. §911(b)(2) and 18 Pa.C.S.A. §911(b)(3).
[2] 18 Pa.C.S.A. §7512(a).
[3] 18 Pa.C.S.A. §903(a)(1) to commit 35 P.S. §780-113(a)(30).
[4] 35 P.S. §780-113(a)(30).
[5] "[T]here is no constitutional right to hybrid representation either at trial or on appeal." *Commonwealth v. Ellis*, 626 A.2d 1137, 1139 (Pa. 1993).

of delivery of a controlled substance were amended to remedy an illegal sentence.[6] As a result, Diaz's total sentence was reduced to a term of 18½ years to 50 years in a state correctional facility.

On November 9, 2018, Diaz filed a notice of appeal to the Pennsylvania Superior Court from this court's order of October 11, 2018. On June 3, 2019, Diaz filed a Motion for Post-Conviction Collateral Relief ("Motion"). Diaz's direct appeal was quashed on June 6, 2019. Lara Hoffert, Esquire ("Attorney Hoffert") was appointed to represent Diaz on June 11, 2019, in his PCRA matter. Attorney Hoffert was subsequently granted permission to withdraw her appearance due to a conflict of interest and David Long, Esquire ("Attorney Long"), was appointed to represent Diaz. On October 22, 2019, Attorney Long filed an Amended PCRA Petition ("Amended Petition") on behalf of Diaz. Diaz claimed within the Amended Petition that his trial counsel, Jacob Gurwitz, Esquire ("Attorney Gurwitz"), was ineffective when he failed to file a direct appeal. A hearing was held on December 3, 2019, to address Diaz's claims. At that time, both Diaz and Attorney Gurwitz presented testimony.

On January 29, 2020, this court entered an order dismissing the Motion and Amended Petition. Diaz filed a *pro se* Notice of Appeal on February 12, 2020. On November 30, 2020, the Pennsylvania Superior Court reversed this Court's order denying PCRA relief and held that Diaz was entitled to the reinstatement of his post-sentence and direct appeal rights *nunc pro tunc*. On December 8, 2020, this Court entered an order reinstating those rights. On December 18, 2020, Diaz filed a post-sentence motion which was denied by this Court on December 22, 2020.

---

[6] The Commonwealth and Diaz, by and through counsel, agreed that the sentences on Count 17, Delivery of a Controlled Substance – Methamphetamine, and Count 19, Delivery of a Controlled Substance – Methamphetamine, were illegal. At sentencing, Diaz had two prior convictions for possession with intent to deliver and was sentenced to serve 90 months to 30 years on both counts. However, the statutory maximum on these offenses was 20 years and not 30 years. See 35 P.S. §780-113(f)(1.1) (ten-year statutory maximum sentence for the delivery of methamphetamine); 35 P.S. §780-115(a) ([a]ny person convicted of a second or subsequent offense under clause (30) of subsection (a) of section 13 of this act or of a similar offense under any statute of the United States or of any state may be imprisoned for a term up to twice the term otherwise authorized[.]). Therefore, this court reduced the term of Diaz's sentences on those counts from 90 months to 30 years down to 90 months to 20 years.

2

Diaz subsequently filed a supplemental post-sentence motion which was denied on February 16, 2021.

On March 22, 2021, Diaz filed an untimely notice of appeal to the Pennsylvania Superior Court. On March 24, 2021, this Court ordered Diaz to file a concise statement of matters complained of on appeal within 21 days from the date of the order's entry on the docket. On April 26, 2021, Diaz filed his statement of errors. On April 26, 2021, Diaz filed a request to extend the deadline to file a statement of errors acknowledging that his concise statement was untimely. Alternatively, Diaz requested that this Court accept his statement of errors *nunc pro tunc*. On April 27, 2021, this Court granted Diaz's request and extended the filing deadline for his concise statement by 21 days.

## DISCUSSION

### Statement of Facts

Due to the extensive nature of the drug investigation in this case, this Court has summarized the relevant events and listed them in chronological order. Some of those events include text messages and telephone calls. During trial, the Commonwealth called Trooper Jay Lownsbery ("Trooper Lownsbery") of the Pennsylvania State Police to testify. *Id.* at 410. He was qualified as an expert in the field of narcotics trafficking and drug culture in Berks County. *Id.* at 414-415. The Commonwealth played the audio recordings, presented text conversations from their wiretap investigation and displayed a visual transcription of the calls and messages for the jury. *Id.* at 417. All calls and texts listed below were interpreted by Trooper Lownsbery.

In 2017, members of the Pennsylvania State Police were conducting a drug investigation in Berks County when they arrested an individual in possession of a large amount of methamphetamine. Notes of Testimony, Jury Trial, June 5-7, 2021 ("N.T.") at 110-111. That

3

individual cooperated with law enforcement and became a confidential informant ("Confidential Informant") used to further that investigation. *Id.* at 111. The Confidential Informant introduced undercover officers to other individuals identified as targets of the investigation. *Id.* at 112. One of those officers, Scott Fidler of the Pennsylvania State Police ("Corporal Fidler"), acting in an undercover capacity, used the Confidential Informant for a period of time before transitioning to direct contact with those targets. *Id.* at 112-113.

In April of 2017, Corporal Fidler came into contact with one of those targets, an individual named Luis Irizarry ("Irizarry"). *Id.* at 113. Corporal Fidler obtained Irizarry's phone number during their interactions and Irizarry told Corporal Fidler that he could contact him if he needed something. *Id.* at 114. As a result, Corporal Fidler began buying methamphetamine directly from Irizarry. *Id.* The quantity of methamphetamine being purchased exceeded the amount typically acquired for personal use. *Id.* Corporal Fidler informed Irizarry that he was a middleman trafficker trying to make money throughout the state. *Id.*

On June 1, 2017, at 6:39 p.m., Irizarry used telephone number 484-336-0442 to call Diaz at 484-599-0187. *Id.* at 418. Trooper Lownsbery testified that this was a conversation where Diaz stated that he had sold off product and he was looking for more crack cocaine to sell. *Id.* at 419.

On June 1, 2017, Corporal Fidler, acting in an undercover capacity, sent a text message to Irizarry at 484-336-0442 asking him if "he was going to be good." *Id.* at 115, 117. Corporal Fidler testified that this meant he was asking Irizarry if he had the drugs. *Id.*

On June 2, 2017, Corporal Fidler texted Irizarry letting him know he was on his way to Reading, Pennsylvania, and had money to buy cocaine from him. *Id.* at 115, 123-124, 422. Irizarry called Corporal Fidler at 2:33 p.m. and directed him to the Speedway off of Lancaster

4

Avenue. *Id.* at 115, 116, 124, 422-423. At 2:41 p.m, Diaz called Irizarry seeking to purchase 3 grams of cocaine. *Id.* at 423. Irizarry then told Diaz that he just added 5 grams of baking soda to 20 grams of cocaine to sell to Corporal Fidler. *Id.* at 423.

On June 2, 2017, Corporal Fidler was acting in an undercover capacity and accompanied by surveillance units. *Id.* at 116. One of those units observed a Nissan Armada depart from the area near Irizarry's residence at the intersection of Birch and Green Street. *Id.* at 168-169. Corporal Fidler, dressed in civilian attire, arrived at the Speedway and waited several minutes in the parking lot before Irizarry arrived. *Id.* at 116, 117, 147. Irizarry and another male individual arrived in a Nissan Armada, tag #JSM9768 ("Nissan Armada"). *Id.* at 147, 148-149, 167. Irizarry exited the Nissan Armada and entered Corporal Fidler's vehicle where Corporal Fidler purchased 25 grams of cocaine from Irizarry for $1,000.00. *Id.* at 117-119. Irizarry then exited Corporal Fidler's vehicle and walked to the passenger side of a Nissan Armada. *Id.* at 119-120, 148. Corporal Fidler exited the parking lot and noticed the Nissan Armada behind him. *Id.* at 120. Corporal Fidler observed that Diaz was the operator of the Nissan Armada. *Id.* at 120, 142. Corporal Fidler provided the cocaine to another trooper which concluded his role in the investigation on that day. *Id.* at 121.

On June 2, 2017, at 9:10 p.m., Irizarry contacted Diaz and told him that he had cooked up 13 grams of cocaine into crack for someone as Diaz's request. *Id.* at 424. Irizarry told Diaz that he was going to deliver it to him and asked Diaz for some marijuana. *Id.* at 424-425. Diaz informed Irizarry that he was out of his best marijuana and only had lower quality product. *Id.* at 425.

On June 5, 2017, at 11:00 a.m., Diaz called Irizarry to let him know that the Percocets had arrived. *Id.* at 426. They discussed how the pill's consistency was a little bit harder. *Id.*

5

Trooper Lownsbery explained that users will crush the pills into a fine powder and it is more difficult with a harder pill. *Id.* There was also some confusion during the conversation due to Diaz's belief that Irizarry was going to be obtaining Percocet from his supplier even though Irizarry stated that he already had the Percocets in his possession. *Id.* at 426-427. Trooper Lownsbery described the relationship between Irizarry and Diaz as a "limited partnership" where they each had their own controlled substances that they assisted one another in acquiring and delivering. *Id.* at 427.

On June 5, 2017, at 11:39 a.m., Diaz called Irizarry to pick up the Percocets. *Id.* at 428. Diaz was calling to let Irizarry know that he was close by and coming to the house to get them. *Id.* They agreed to meet at Diaz's garage at Sauls Court. *Id.*

On June 5, 2017, Trooper Teresa Cloman of the Pennsylvania State Police ("Trooper Cloman") was advised that Irizarry was going to meet with a black male at Mulberry Street near Walnut Street. *Id.* at 151. She set up surveillance nearby at 10th Street and Elm Street in Reading near Saul's Court. *Id.* While conducting surveillance, Trooper Cloman observed Irizarry's vehicle exit Saul's Court. *Id.* at 152. It was followed by a Nissan Armada. *Id.* They were in tandem together. *Id.* at 159. Trooper Cloman was part of the surveillance team on June 2, 2017, and recognized this Nissan Armada as the same Nissan Armada that was present at the drug transaction on June 2, 2017. *Id.* Trooper Cloman identified Diaz as the operator of the Nissan Armada on June 5, 2017. *Id.* at 152-153, 159.

Irizarry and Diaz traveled together to New York in the late afternoon on June 5, 2017. *Id.* at 428. While in New York, Diaz sent a text message to Irizarry letting him know he would be out shortly and he was "checking this bud before I take it." *Id.* at 428. Irizarry then responded "ok." *Id.*

6

On June 6, 2017, at 12:37 a.m., a text message was sent to Irizarry from an unknown individual (#904-860-5319) asking if Irizarry was around because he needed to see him. *Id.* at 429-430. Irizarry responded that he wasn't in town yet. *Id.* at 430. In response, the unknown individual asked how long and if Irizarry's partner was around. *Id.* Irizarry texted "he is with me." *Id.* Irizarry instructed the unknown individual to come to Birch and Green with a pack of cigars. *Id.* The cigars would be used to smoke marijuana. *Id.* at 431. The unknown individual asked if Irizarry had the same stuff to which Irizarry responded "yeah." *Id.* The unknown individual asked Irizarry for a 16th which is known to be a small amount of marijuana for personal use. *Id.* at 430-431. The unknown individual asked Irizarry how long and told him he needed a "hundo" which meant that he wanted $100.00 of crack cocaine. *Id.* at 430-431. Irizarry and the unknown individual exchanged a few more texts where Irizarry explained that he was on his way from New York. *Id.* at 430. Trooper Lownsbery believed that this unknown individual was the person who supplied the Percocets to Irizarry and was now looking to obtain controlled substances. *Id.* at 430-431.

In the evening/morning hours of June 5th and June 6th, surveillance units observed the Nissan Armada traveling on Interstate 78 returning from the New York area. *Id.* at 178-179, 198, 356-357. Irizarry was present in the vehicle based on cell phone pings from his phone. *Id.* at 180, 188-189, 357. The Nissan Armada entered the city of Reading and parked in the 700 block of Washington Street in the early morning hours of June 6, 2017. *Id.* at 181, 193, 199, 357. Diaz was observed exiting the driver's side of the Nissan Armada and retrieving a black duffel bag from the Nissan Armada before entering the address at 735 Washington Street. *Id.* at 193, 199. Another individual also exited the Nissan Armada and stood outside. *Id.* at 199. Diaz exited 735 Washington Street 10 minutes later without the bag and drove away in the Nissan

7

Armada with the other individual. *Id.* at 199-200. The Nissan Armada was then observed at the intersection of Birch Street and Greet Street approximately 20 minutes later. *Id.* at 181, 200-201. The Nissan Armada then continued to Cotton Street and Chapel Terrace where the other individual who had previously stood outside of the Nissan Armada exited the vehicle and walked on Chapel Terrace. *Id.* at 201.

On June 6, 2017, at 4:09 p.m., Irizarry sent out 27 text messages all to different numbers with the word "Fire." *Id.* at 431. These 27 separate numbers were Irizarry's customers. *Id.* This text meant that Irizarry had freshly cooked cocaine into crack and it was available and ready for purchase. *Id.*

On June 6, 2017, Corporal Fidler, acting in an undercover capacity, sent a text message to Irizarry requesting to obtain some crystal methamphetamine. *Id.* at 126. At that time, Corporal Fidler was purchasing 4 ounces at a time for $3,000.00. *Id.*

On June 7, 2017, a text conversation occurred between Corporal Fidler and Irizarry where Corporal Fidler let Irizarry know that he was looking to come down and purchase more methamphetamine around 6:00 p.m. *Id.* at 432-433. They agreed that Corporal Fidler would buy the usual amount of 4 ounces. *Id.* at 433.

On June 7, 2017, after talking with Corporal Fidler, Irizarry called Rivera to place an order for 4 ounces of methamphetamine. *Id.* at 434. They agreed to meet at the Saul's Court parking lot. *Id.* Rivera provided Irizarry with 8 ounces of methamphetamine when they met. *Id.* at 437.

On June 7, 2017, at 6:15 p.m., Corporal Fidler placed a call to Irizarry to let him know he was on his way. *Id.* at 435. They arranged to meet at a local 7-Eleven. *Id.* at 126, 435.[7] At 6:24

---

[7] During his direct examination of Corporal Fidler, Assistant District Attorney Skayhan finished discussing the events of June 2, 2017, and told Corporal Fidler that he wanted "to move onto another date." N.T. at 126. The

8

p.m., Corporal Fidler arrived at the 7-Eleven and received a phone call from Irizarry. *Id.* at 126, 437. Irizarry asked Corporal Fidler if he wanted an additional 4 ounces of methamphetamine that he could pay back later. *Id.* at 126-127, 130, 437. They discussed the quality of the crystal methamphetamine and Irizarry directed Corporal Fidler to an area on Mercer Street approximately 3 blocks away. *Id.* at 127, 437-438. Corporal Fidler was alone in his vehicle but there were surveillance units present. *Id.* Trooper Cloman was conducting surveillance on that day and observed the Nissan Armada in the area of the 7-Eleven. *Id.* at 154-155. Corporal Fidler traveled to an apartment complex on Mercer Street where he met with Irizarry. *Id.* at 128. Irizarry arrived on foot. *Id.* at 130. Corporal Fidler did not see how he was transported to that location but surveillance units observed that Diaz drove the Nissan Armada to and from the drug transaction. *Id.* at 130, 202. Irizarry got into Corporal Fidler's vehicle and provided him with a bag of crystal methamphetamine in exchange for $3,000.00. *Id.* at 128, 130. They discussed the quality of the product and Irizarry directed Corporal Fidler out of the complex where he dropped him off. *Id.* As Irizarry exited the vehicle, Corporal Fidler asked Irizarry if he brought him more cocaine. *Id.* Irizarry then agreed to provide Corporal Fidler a free "8 ball" of cocaine as they had previously had a text fight about the poor quality of the cocaine Irizarry had sold to Corporal Fidler on June 2nd. *Id.* at 128-129. Irizarry left on foot. *Id.* at 130. Corporal Fidler provided the methamphetamine to another trooper which concluded his role in the investigation on that day. *Id.* at 130.

---

transcript identifies the other date as June 2, 2017, on line 6 and line 16 on page 126. *Id.* However, on pages 129 to 130 of the transcript, Assistant District Attorney Skayhan identifies this other date as June 7th and not June 2nd. Corporal Fidler also references the June 7th date on page 139. Trooper Cloman references June 7th on page 153. Based on the testimony presented, the other day was June 7th and not June 2nd as identified in the transcript on page 126.

9

On June 7, at 7:06 p.m., Rivera called Irizarry to let him know that the transaction with Corporal Fidler had been completed and he had the money so they agreed to meet up at the Saul's Court parking lot. *Id.* at 438.

On June 8, 2017, at 7:33 p.m., Irizarry called Diaz asking him for two Percocets for his barber. *Id.* at 439.

On June 8, 2017, surveillance units observed Irizarry's vehicle outside of 735 Washington Street. *Id.* at 218-219. Diaz was present and talking on his cell phone outside. *Id.* at 220. Irizarry was also there and talking on his cell phone. *Id.* Diaz entered into the driver's side of his Nissan Armada. *Id.* at 221. Irizarry and a young boy who was with Irizarry entered the Nissan Armada and they drove away. *Id.* at 221, 234.

On June 9, 2017, at 5:41 p.m., Diaz called Irizarry asking him to prepare some crack cocaine for him. *Id.* at 440. Irizarry said that he was available and Diaz agreed to go to Irizarry's house. *Id.* Irizarry asked Diaz to bring marijuana over but Diaz informed him that he ran out of some of it. *Id.* Irizarry then asked Diaz for fresh baking soda to prepare crack cocaine. *Id.*

On June 9, 2017, at 5:51 p.m., Diaz called Irizarry asking if he needed a scale to weigh the product. *Id.* at 440-441. Irizarry told Diaz that he had a scale and that they were just waiting on Diaz to arrive with the baking soda so they could prepare the crack cocaine. *Id.* at 441. Diaz said that he was on his way. *Id.*

On June 10, 2017, at 10:15 p.m., Irizarry called Diaz on his business phone instead of his personal phone. *Id.* at 441-442. They discussed how Irizarry didn't call on his usual phone and then talked about hanging out later. *Id.* at 441-442.

10

On June 12, 2017, Irizarry sent Diaz a text message placing an order for marijuana. *Id.* at 442. On June 12, 2017, Trooper Cloman was informed of a drug transaction that was scheduled to occur between Diaz and Irizarry in the area of 1233 Green Street. *Id.* at 155. Irizarry resided in an apartment near this area at the intersection of Birch Street and Green Street. *Id.* at 156. While conducting surveillance, Trooper Cloman observed the Nissan Armada park on Birch Street and beep its horn. *Id.* After receiving no response, Trooper Cloman observed Diaz exit the Nissan Armada and walk to the corner of 1233 Green Street and knock on the apartment's door. *Id.* Irizarry opened the door and Diaz entered the apartment. *Id.* After a short time, both Diaz and Irizarry exited the apartment. *Id.* Diaz departed in the Nissan Armada and Irizarry returned to his apartment. *Id.*

On June 19, 2017, Corporal Fidler, acting in an undercover capacity, engaged in text conversations with Irizarry about purchasing methamphetamine. *Id.* at 131. Irizarry directed Corporal Fidler to Pendora Park in Reading and they met at the basketball courts. *Id.* at 131-132. Corporal Fidler observed that Irizarry was in the same Nissan Armada that he saw on June 2nd. *Id.* at 132. Irizarry exited the Nissan Armada and entered Corporal Fidler's vehicle. *Id.* Diaz was also present in the Nissan Armada and seated in the driver's seat. *Id.* at 132, 142. After Irizarry entered Corporal Fidler's vehicle, he provided Corporal Fidler with a bag of crystal methamphetamine. *Id.* at 133. Corporal Fidler complained about the quality of the product and, in response, Irizarry produced an additional bag of methamphetamine of lesser quality and offered it to Corporal Fidler for a lower price of $2,800.00 that he could pay back later. *Id.* at 133-134. Corporal Fidler then talked with Irizarry about purchasing a pound of methamphetamine. *Id.* at 134. Irizarry informed Corporal Fidler that it was $10,000.00 for a pound of methamphetamine. *Id.* Corporal Fidler and Irizarry agreed that Corporal Fidler could

11

pay $7,000.00 up front and pay off the remaining $3,000.00 later. *Id.* Irizarry exited Corporal Fidler's vehicle and returned to the Nissan Armada. *Id.*

On June 20, 2017, a confidential informant met with Diaz at Saul's Court off of Mulberry Street and Elm Street. *Id.* at 392. Diaz arrived in a Nissan Armada. *Id.* The confidential informant purchased a quantity of methamphetamine from Diaz which was then turned over to law enforcement. *Id.* at 392, 395-396. Irizarry was not involved in that transaction. *Id.* at 394.

On June 25, 2017, at 2:42 p.m., Roberto Ortiz ("Ortiz") contacted Irizarry and asked him for powdered cocaine. *Id.* at 442. Irizarry informed Ortiz that he did not have any and directed him to Diaz who knew someone who could supply powdered cocaine. *Id.* at 443. They discussed the two phone numbers used by Diaz in order to contact him. *Id.*

On June 27, 2017, Robert Undheim ("Undheim") had a text conversation with Irizarry requesting a $50.00 package of crack cocaine and agreeing to meet at Wawa. *Id.* at 445-446. On June 27, 2017, the Pennsylvania State Police were notified of a potential drug deal that was to take place in the Wawa parking lot off Route 61 and Reading Crest Boulevard. *Id.* at 183, 203. On that date, Trooper Clint Long observed an unknown male, later identified as Undheim, in front of the Wawa at that location. *Id.* at 183. Approximately 5 minutes later, Irizarry and Diaz arrived in a Nissan Armada. *Id.* at 184, 203-205. Undheim entered the rear seat on the driver's side of the Nissan Armada. *Id.* at 184, 205. After a few minutes, Undheim exited the Nissan Armada and it left the parking lot. *Id.* at 185.

On June 28, 2017, at 5:47 p.m., Irizarry called Corporal Fidler to let him know that his phone died. *Id.* at 447. Corporal Fidler told him that he was on his way to Reading and he had Irizarry's money plus an additional $3,000.00. *Id.* at 447-448. They agreed to meet at the 7-Eleven. *Id.* at 448.

12

On June 28, 2017, at 5:49 p.m., Irizarry called Rivera to place an order for methamphetamine to deliver to Corporal Fidler. *Id.* at 448. They agreed to meet at Saul's Court. *Id.* at 449.

On June 28, 2017, at 5:50 p.m., Irizarry called Diaz and talked to him about buying a whole pound of methamphetamine from Rivera. *Id.* at 450. Irizarry told Diaz that Corporal Fidler had the $2,800.00 owed from their previous deal plus another $3,000.00 and that this money would allow him to buy more methamphetamine to sell to other people. *Id.* at 450. Irizarry also talked about how he was concerned that all of his money was "out on the street" and he didn't have any money available to buy cocaine to make crack. *Id.* at 450. Irizarry informed Diaz that he was meeting Rivera at the Saul's Court parking lot. *Id.* at 451. Diaz offered to call Rivera and tell him that Irizarry was good for the money and would repay him if he let him have the whole pound. *Id.* at 451.

On June 29, 2017, a text conversation occurred between Irizarry and Martinez where Irizarry asked Diaz how much he owed him for the marijuana. *Id.* at 452. They discussed dollar amounts and then agreed to settle the amount at the end of the conversation. *Id.*

On July 9, 2017, at 4:20 p.m., Irizarry called Diaz asking if he was still dealing in ounces of marijuana because someone was looking to buy an ounce. *Id.* at 453. Diaz replied that he was not and is now only dealing in 1/8th ounce increments. *Id.* Irizarry told Diaz that he had an ounce of good marijuana and didn't want to sell to this person but did want to keep him happy. *Id.* at 453-454. Irizarry and Diaz then discussed numbers as Irizarry was figuring out how many eighth ounces of marijuana he would need to take care of the people he was supplying. *Id.* at 454. Irizarry came up with a number and Diaz told Irizarry that he needed to check with someone to see if all of the marijuana is available. *Id.* at 454.

13

On July 9, 2017, at 4:28 p.m., Diaz called Irizarry directing him to go to the stash location at 735 Washington Street. *Id.* at 454-455.

On July 11, 2017, at 3:19 p.m., Rivera called Diaz but Diaz didn't recognize his voice. *Id.* at 465-466. Rivera identified himself by his street name to Diaz and put Irizarry on the phone. *Id.* at 466. During the conversation, Rivera offered Irizarry 6 ounces of methamphetamine at a discounted price. *Id.* Irizarry told him that he would think about it and call him back to let him know if he would take it. *Id.*

On July 12, 2017, at 2:32 p.m., Irizarry called Diaz about the 6 ounces of methamphetamine he obtained from Rivera. *Id.* at 467. Irizarry asked Diaz if he would reach out to another individual to see if he would be interested in buying methamphetamine at $400.00 per ounce. *Id.* at 467. Irizarry told Diaz it was good quality and explained how he could sell it to make a profit. *Id.* He gave Diaz a hard time about how Diaz had never given him product of this high quality. *Id.* Diaz told Irizarry that he was going to check with his guy and get back to him about it. *Id.*

On July 12, 2017, at 2:36 p.m., Diaz called Irizarry and told him that a guy was over at 735 Washington Street and expecting Irizarry to stop by. *Id.* at 468. Irizarry sent Diaz a text message 7 minutes later letting him know he was at Washington Street. *Id.*

On July 12, 2017, at 10:55 p.m., Irizarry sent a text message out to Mike Rowe saying "New Fire" indicating that he had new crack cocaine available for sale. *Id.* at 468.

On July 14, 2017, Mike Rowe responded to Irizarry asking if he could stop by his house. *Id.* Irizarry agreed. *Id.*

On July 14, 2017, at 6:28 p.m., Irizarry called Mike Rowe ("Rowe") to confirm his order of $100.00 worth of crack cocaine. *Id.* at 469. Irizarry confirmed that he would bring it over and

14

Rowe asked about the quality of the product. *Id.* Irizarry assured Rowe that it was good quality, they agreed on a price and that Irizarry would deliver it. *Id.* Later that day, surveillance units observed Diaz and Irizarry arrive at the apartment complex on State Hill Road in a Nissan Armada. *Id.* at 206, 469. Irizarry exited the passenger side of the Nissan Armada and entered into one of the apartments. *Id.* He was inside for approximately one minute before exiting the apartment and leaving in the Nissan Armada. *Id.* Diaz was always the driver of the Nissan Armada. *Id.* at 210.

On July 16, 2017, at 12:22 p.m., Irizarry contacted Diaz to try to get into touch with another individual, Josh Manon. *Id.* at 469-470. Irizarry was selling marijuana with him and was one of the few people in the area who had it. *Id.* at 470. Irizarry did meet with Josh Manon on two occasions after this conversation to purchase marijuana oil. *Id.*

On July 18, 2017, at 3:36 p.m., Diaz called Irizarry to purchase methamphetamine for his own personal use. *Id.* at 471. They agree on a price of $100.00 for an 8-ball of methamphetamine. *Id.* at 471.

On July 18, 2017, at 3:48 p.m., Diaz called Irizarry asking how soon he can have it. *Id.* at 471. They agreed to meet in 5 minutes at the Saul's Court garage. *Id.*

On July 18, 2017, at 9:58 p.m., Diaz called Irizarry about getting 10 or 15 grams of crack cocaine for another person. *Id.* at 472. Irizarry said he had 15 grams of powdered cocaine that he hadn't put together yet. *Id.* Diaz left it up to Irizarry to decide whether he wanted to do it and Irizarry said that he would since he was out of money and wanted to buy marijuana. *Id.* Irizarry told Diaz that the cost was $38.00 per gram. *Id.*

On July 18, 2017, at 10:02 p.m., Diaz called Irizarry saying that this other individual wanted 10 grams of crack cocaine at the agreed price of $38.00 per gram. *Id.* at 473. Irizarry

15

became upset because that would leave him with 5 grams which isn't very much for sale. *Id.* Diaz laughed and told Irizarry to just bag it up because he didn't care. *Id.* Irizarry told Diaz that the crack cocaine was almost done. *Id.*

On July 21, 2017, at 10:04 p.m., Diaz called Irizarry and asked him to call another marijuana dealer to find out how much it would cost to get one ounce. *Id.* at 473. Diaz had an individual who was seeking to buy one ounce of marijuana but, since it didn't make sense for Diaz, a marijuana dealer, to call another marijuana dealer to buy an ounce, he asked Irizarry to make the call. *Id.* Irizarry agreed to call to find out the price. *Id.* at 472-473.

On July 21, 2017, at 12:52 p.m., Diaz called Irizarry to tell him not to call Rivera until they were able to talk. *Id.* at 474. Irizarry agreed and they decided that they were going to meet at Saul's Court. *Id.*

On July 24, 2017, there was a text conversation between Dean Moyer ("Moyer") and Irizarry. *Id.* at 474. In that conversation, Moyer asked Irizarry for crack cocaine in $20.00 amounts. *Id.* at 475. Irizarry said he is only selling it in $50.00 increments. *Id.* Moyer told Irizarry he would buy $50.00 in crack cocaine. *Id.* Irizarry and Moyer agreed to meet at the laundromat on Hampden Boulevard in Reading. *Id.* Dean Moyer said he would be on a bike. *Id.*

On July 24, 2017, law enforcement received information that there was going to be a meet-up happening at the 2300 block of Hampden Boulevard across from a laundromat. *Id.* at 227. They were told that the suspect would be arriving on a motorcycle. *Id.* at 228. An individual arrived on a motorcycle at that location and the Nissan Armada arrived approximately 10 minutes later. *Id.* at 228. The individual on the motorcycle approached the Nissan Armada's passenger window and remained there for a few minutes interacting with an individual believed

16

to be Irizarry. *Id.* at 228-230. After their interaction, both the Nissan Armada and motorcycle left that location. *Id.* at 230.

On August 2, 2017, a search warrant was executed by law enforcement at 1233 Green Street, Reading, Pennsylvania, which was identified Irizarry's residence. *Id.* at 242-243. Irizarry was present with his girlfriend and two children. *Id.* at 243-244. Three phones were located during the search, one of which ended with the numbers 0442. *Id.* at 244. In addition to the phones, law enforcement discovered controlled substances, $1,800.00 in U.S. currency and a handgun with an obliterated serial number. *Id.* at 244-243. Irizarry was taken into custody. *Id.* at 245.

A second search warrant was also executed at 735 Washington Street, Reading, Pennsylvania. *Id.* at 250-251, 264. There were no individuals present when the warrant was executed. *Id.* at 252. The apartment had very little furniture and no decorations. *Id.* at 252-253. Law enforcement discovered packaging material, boxes of plastic bags, baking soda, acetone, creatine, a digital scale, a coffee grinder and a vacuum sealer in the kitchen. *Id.* at 253, 346. There was also a duffel bag containing packaging material, another digital scale, suboxone, some marijuana residue and an empty heroin packet. *Id.* at 253, 267. No food was located at that location. *Id.* at 256.

At trial, the Commonwealth called Nelson Rivera ("Rivera") to testify against Diaz. *Id.* at 290-331. Rivera was facing criminal charges at the time of his testimony. *Id.* at 290, 317. Rivera testified that he sold methamphetamine to Irizarry twice in June and July of 2017. *Id.* at 298. Diaz was always present during the drug sales. *Id.* Between January 2017 and August 2017, Rivera sold hundreds of pounds of methamphetamine in and around Reading. *Id.* at 321.

17

During the first of the two drug transactions, Irizarry called Rivera and told him he needed a half pound of methamphetamine. *Id.* at 300. They met on Cotton Street for the drug transaction. *Id.* Rivera walked up to a vehicle he described as a "truck" and saw Diaz in the driver's side. *Id.* at 300, 303. Diaz informed Rivera that Irizarry was "inside the house" and would be out shortly. *Id.* at 300, 303. Irizarry came out and Rivera gave him a half pound of methamphetamine. *Id.* They agreed that Irizarry could pay Rivera after he delivered the drugs to his customers. *Id.* At that time, a phone call was received from another individual alerting them to the possible presence of law enforcement. *Id.* After making an attempt to determine whether the police were actually present, Rivera later met with Irizarry and Diaz at a separate location on Mineral Spring Road and received payment for the half pound of methamphetamine. *Id.* at 300-302; 327.

The second drug transaction between Irizarry and Rivera was initiated when Irizarry called Rivera and asked him to meet on Mulberry Street. *Id.* at 303. They met in a parking lot owned by Diaz. *Id.* Once they arrived, Rivera said that he had a little over a half pound of methamphetamine and needed a scale. *Id.* at 303-304. Diaz suggested that they go to his place on Washington Street to open up the package. *Id.* at 304. They traveled to Washington Street in a "truck" and entered a house at 735 Washington Street. *Id.* at 304, 325-326. Diaz and Rivera went inside with a third individual identified by Rivera as a "crackhead." *Id.* at 304, 390. Diaz retrieved a scale and vacuum seal. *Id.* Rivera cut open his bag and weighed the drugs on Diaz's scale. *Id.* Rivera resealed his bag and they returned to their vehicle. *Id.* Diaz, Rivera and Irizarry then traveled to an apartment complex near a 7-Eleven where Irizarry sold methamphetamine for $3,000.00 to an individual Rivera subsequently learned was Corporal Fidler acting in an undercover capacity. *Id.* at 304-306.

18

During the timeframe of June and July of 2017, Rivera was selling methamphetamine to many people other than Irizarry. Id. at 306. Rivera testified to his familiarity with how certain drugs are described by buyers and sellers of narcotics. Id. at 306-309. He also explained how dealers often have multiple phones that are used for certain individuals or groups of people. Id. at 309. Rivera testified that he had a few stash houses and didn't keep his drugs at his residence. Id. at 310. Rivera stated that he was receiving drugs from his supplier and then distributing them to other individuals throughout Reading. Id. at 314. There were between 40 and 47 people involved in this drug distribution network. Id. at 314, 315, 355.

At trial, the Commonwealth presented testimony from Detective Sergeant Pasquale Leporace of the Berks County District Attorney's Office ("Detective Leporace"). Id. at 336-398. Detective Leporace was qualified as an expert in drug and narcotics law enforcement. Id. at 340. Detective Leporace testified that he believed the address of 735 Washington Street was a small to midlevel processing center used to break down bulk amounts of drugs into street and midlevel quantities and as a possible stash location. Id. at 343-349. He also described the wiretap investigation into this drug organization. Id. at 350-363. Detective Leporace stated that law enforcement identified Irizarry as a drug dealer with two suppliers, Nelson Rivera and Angel Concepcion. Id. at 354-355. Detective Leporace testified that Diaz utilized a phone number ending in 0187 to conduct drug transactions. Id. at 356, 359, 375-376. Whenever that number contacted Irizarry to schedule a meeting, surveillance units observed that it was only Diaz who would show up to meet with Irizarry. Id. Also, when surveillance units observed Diaz with Irizarry, there was very little communication between them. Id. The wiretap investigation involved 11 phone numbers over the course of 60 days. Id. at 355.

19

## Sufficiency of the Evidence - Generally

Diaz claims that the evidence was insufficient to sustain his convictions for corrupt organizations, 18 Pa.C.S.A. §911(b)(2), corrupt organizations, 18 Pa.C.S.A., §911(b)(3), criminal use of communication facility, 18 Pa.C.S.A. §7512(a), possession of a controlled substance with intent to deliver, 35 P.S. §780-113(a)(30) and conspiracy to commit possession with intent to deliver a controlled substance, 18 Pa.C.S.A. §903.

When reviewing a challenge to the sufficiency of the evidence supporting a defendant's conviction, an appellate court is required to evaluate the record "in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence." *Commonwealth v. Rahman*, 75 A.3d 497, 500 (Pa. Super. 2013) (citation omitted).

> The test for determining the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the Commonwealth as the verdict winner and drawing all proper inferences favorable to the Commonwealth, the jury could have determined that all of the elements of the crime have been established beyond a reasonable doubt. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. The facts and circumstances established by the Commonwealth need not be absolutely incompatible with the defendant's innocence, but the question of any doubt is for the jury unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

*Commonwealth v. Smith*, 848 A.2d 973, 977 (Pa. Super. 2004) (citation omitted).

An appellate court "may not substitute [its] judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld." *Rahman*, 75 A.3d at 501.

### Sufficiency of the Evidence – Corrupt Organizations

Diaz argues that the evidence was insufficient to sustain his convictions on two counts of corrupt organizations.

The crime of corrupt organizations is defined, in relevant part, as follows:

§911 Corrupt organizations

(b) Prohibited activities.—

> (2) It shall be unlawful for any person through a pattern of racketeering activity to acquire or maintain, directly or indirectly, any interest in or control of any enterprise.
>
> (3) It shall be unlawful for any person employed by or associated with any enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

18 Pa.C.S.A. §911(b)(2), (3).

Section 911(h) of the Crimes Code defines a "pattern of racketeering activity" as "a course of conduct requiring two or more acts of racketeering activity[.]" 18 Pa.C.S.A. §911(h)(4). The definition of "racketeering activity" includes "[a]n offense indictable under section 13 of the act of April 14, 1972 (P.L. 233, No. 64), known as The Controlled Substance, Drug, Device and Cosmetic Act (relating to the sale and dispensing of narcotic drugs)" and/or conspiracy to commit the same. 18 Pa.C.S.A. §911(h)((1)(ii), (iii). The term "enterprise" as

21

used in this section is defined as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity, engaged in commerce and includes legitimate as well as illegitimate entities and governmental entities." 18 Pa.C.S.A. §911(h)(3).

In this case, when viewing the evidence in the light most favorable to the Commonwealth as the verdict winner and drawing all proper inferences favorable to the Commonwealth, the jury could have determined that all of the elements of corrupt organizations had been established beyond a reasonable doubt. The evidence demonstrated that Diaz, Rivera and Irizarry were involved in a drug distribution network in Berks County. They engaged in a "pattern of racketeering activity" by orchestrating multiple drug deliveries to Corporal Fidler and other individuals during the course of law enforcement's investigation. Although Rivera only sold to Irizarry twice, he testified that he was part of a larger drug distribution network. Regarding Diaz and Irizarry, Trooper Lownsbery described the relationship between Irizarry and Diaz as a "limited partnership" where they each had their own controlled substances that they assisted each other in acquiring and delivering. *Id.* at 427. During a June 6th text conversation, Irizarry even acknowledged this partnership when an unknown individual asked Irizarry if his "partner" was around and Irizarry responded by texting "he is with me." *Id.* at 430. The intercepted telephone calls and text messages provided additional evidence of the relationship between Rivera, Irizarry and Diaz as they processed orders and relied on each other to further their shared goal of distributing narcotics in Berks County. Diaz was intimately involved in this illegal enterprise. He is not entitled to relief.

## Sufficiency of the Evidence – Criminal Use of Communication Facility

Diaz next claims that the evidence was insufficient to sustain the verdict for criminal use of a communication facility.

The crime of criminal use of a communication facility is defined as follows:

§7512 Criminal use of a communication facility

(a) Offense defined.--A person commits a felony of the third degree if that person uses a communication facility to commit, cause or facilitate the commission or the attempt thereof of any crime which constitutes a felony under this title or under the act of April 14, 1972 (P.L. 233, No. 64), known as The Controlled Substance, Drug, Device and Cosmetic Act. Every instance where the communication facility is utilized constitutes a separate offense under this section.

18 Pa.C.S.A. §7512(a).

Section 7512(b) of the Crimes Code defines "communication facility" as "a public or private instrumentality used or useful in the transmission of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part, including, but not limited to, telephone, wire, radio, electromagnetic, photoelectronic or photo-optical systems or the mail." 18 Pa.C.S.A. §7512(b).

In this case, when viewing the evidence in the light most favorable to the Commonwealth as the verdict winner and drawing all proper inferences favorable to the Commonwealth, the jury could have determined that all of the elements of criminal use of a communication facility had been established beyond a reasonable doubt. The evidence showed that Diaz regularly used his cell phone to communicate with Irizarry and other individuals to arrange for the acquisition and distribution of narcotics in Berks County. Law enforcement's interception of Diaz's

23

communications established that he was engaging in drug distribution activity on an almost daily basis. The details concerning the scheduling of drug deals contained in the text messages and phone calls between Diaz and Irizarry were regularly corroborated by surveillance units. There is no merit to Diaz's claim.

## Sufficiency of the Evidence – Conspiracy to Commit Possession with Intent to Deliver a Controlled Substance and Possession with Intent to Deliver a Controlled Substance

Diaz claims that the evidence was insufficient to sustain the jury's verdict for possession with intent to deliver a controlled substance and conspiracy to commit the same. This Court notes that Diaz was convicted of 6 counts of delivery of a controlled substance, not possession with intent to deliver a controlled substance. Additionally, Diaz was convicted of conspiracy to commit delivery of methamphetamine and conspiracy to commit delivery of cocaine, not conspiracy to commit possession with intent to deliver those substances.

The crime of delivery of a controlled substance is defined as follows:

§ 780-113. Prohibited acts; penalties

(a) The following acts and the causing thereof within the Commonwealth are hereby prohibited:

...

(30) Except as authorized by this act, the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance by a person not registered under this act, or a practitioner not registered or licensed by the appropriate State board, or knowingly creating, delivering or possessing with intent to deliver, a counterfeit controlled substance.

24

35 P.S. §780-113(a)(30). The terms "deliver" or "delivery" are defined as "the actual, constructive, or attempted transfer from one person to another of a controlled substance, other drug, device or cosmetic whether or not there is an agency relationship." 35 P.S. §780-102.

The Crimes Code defines conspiracy as follows:

§903. Criminal conspiracy

(a) Definition of conspiracy.--A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

> (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
>
> (2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S.A. §903(a).

> The essence of a criminal conspiracy is a common understanding, no matter how it came into being, that a particular criminal objective be accomplished. Therefore, a conviction for conspiracy requires proof of the existence of a shared criminal intent. An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities. Thus, a conspiracy may be inferred where it is demonstrated that the relation, conduct, or circumstances of the parties, and the overt acts of the co-conspirators sufficiently prove the formation of a criminal confederation. The conduct of the parties and the circumstances surrounding their conduct may create a web of evidence linking

25

the accused to the alleged conspiracy beyond a reasonable doubt. Even if the conspirator did not act as a principal in committing the underlying crime, he is still criminally liable for the actions of his co-conspirators in furtherance of the conspiracy.

*Commonwealth v. McCall*, 911 A.2d 992, 996-997 (Pa. Super. 2006) (citation omitted).

In this case, Diaz was charged with and convicted of conspiring to commit and committing drug deliveries on six separate occasions: 1) June 2, 2017; 2) June 7, 2017; 3) June 19, 2017; 4) June 27, 2017; 5) July 14, 2017; and July 24, 2017. At trial, there was no indication that Diaz physically handed drugs to another person. However, as set forth above, Diaz was clearly a co-conspirator with Irizarry and Rivera. The testimony established that Rivera supplied Irizarry and Diaz with methamphetamine for distribution on two occasions and that he was part of a large distribution network. Additionally, the evidence showed that Irizarry and Diaz were actively involved in the sale of methamphetamine and cocaine throughout Berks County which included sales to Corporal Fidler. Even though Diaz did not act as a principal in committing the drug deliveries, he is still criminally liable for the actions of Rivera and Irizarry in furtherance of the conspiracy. *See McCall, supra.* Therefore, when viewing the evidence in the light most favorable to the Commonwealth as the verdict winner and drawing all proper inferences favorable to the Commonwealth, the jury could have determined that all of the elements of conspiracy to commit delivery of a controlled substance and delivery of a controlled substance had been established beyond a reasonable doubt. Diaz's claim lacks merit.

<u>Denial of Diaz's Objection to the Commonwealth's Pretrial Motion in Limine</u>

Diaz claims that this Court erred and/or abused its discretion when it denied his objections to the Commonwealth's pretrial motion in limine. Specifically, the Commonwealth requested and this Court agreed to take judicial notice of Diaz's preliminary arraignment sheet

26

which included the phone numbers provided to the Magisterial District Judge by Diaz. N.T. at 9-14.

Rule 201 of the Pennsylvania Rules of Evidence sets for the kind of facts that may be judicially noticed as follows:

The court may judicially notice a fact that is not subject to reasonable dispute because it:

(1) is generally known within the trial court's territorial jurisdiction; or

(2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

Pa.R.E. 201(b). "[A] court in appropriate circumstances may take judicial notice of court records." *Conchado v. Com., Dept. of Transp.,* 941 A.2d 792, 794 (Pa.Cmwlth. 2008).

In this case, the Commonwealth stated that, during Diaz's arraignment, the Magisterial District Judge and Diaz had a conversation where certain information was provided by Diaz and included on the preliminary arraignment form by the Magisterial District Judge. N.T. at 11. During that conversation, the Commonwealth stated that two phone numbers were provided by Diaz which were relevant to the investigation and included on that form. *Id.* at 9. The Commonwealth introduced a copy of the preliminary arraignment form at trial as Exhibit 83. *Id.* at 484, 640. The form is titled as "Arraignment Information" and states that it "shall be completed by the Magisterial District Judge." *Id.* at 640. Diaz's name is listed in the caption. *Id.* There are two telephone numbers listed on the arraignment form: 484-599-0178 and 484-782-4636. *Id.* The signature of the Magisterial District Judge is on the bottom of the document indicating that the form was completed by the Magisterial District Judge. *Id.* The facts contained on this form were not subject to reasonable dispute because they can be accurately and readily determined from a source, the Magisterial District Judge, whose accuracy cannot

27

reasonably be questioned. Additionally, when the preliminary arraignment form was marked as Exhibit 83, Diaz joined in the motion requesting that this Court take judicial notice of the document. *Id.* at 336. Therefore, this Court did not err in taking judicial notice of the preliminary arraignment form.

**The Commonwealth's Objection to Diaz's Line of Questioning**

Diaz claims that this Court erred and/or abused its discretion when it sustained the Commonwealth's objection to his questions posed to Trooper Steven Nesbit ("Trooper Nesbit") about conversations Trooper Cloman had with other troopers following her testimony. Diaz alleged that, after Trooper Cloman finished testifying, she exited into a hallway with other troopers and discussed her testimony with them. N.T. at 212-213. Diaz was concerned that Trooper Nesbit's testimony was influenced by Trooper Cloman. *Id.* at 215.

"At a party's request the court may order witnesses sequestered so that they cannot learn of other witnesses' testimony." Pa.R.E. 615. "Once made, a sequestration order, like any order of the court, should be diligently enforced." *Commonwealth v. Kaye*, 335 A.2d 430, 433 (Pa. Super. 1975).

In this case, no sequestration order was requested by Diaz prior to Trooper Nesbit's testimony. N.T. at 214. Therefore, the Commonwealth witnesses were not prohibited from discussing their testimonies with each other. Furthermore, Trooper Nesbit testified that he "[didn't] know exactly what [Trooper Cloman] was talking about" and that he was reading his reports to refresh his memory of what occurred when she was having conversation in the hallway. N.T. at 212. Therefore, further questioning of Trooper Nesbit concerning Trooper Cloman's conversations was irrelevant. *See Commonwealth v. Wynn*, 850 A.2d 730, 733 (Pa. Super. 2004) (citation omitted) ("Evidence is admissible if it is relevant-that is, if it tends to

28

establish a material fact, makes a fact at issue more or less probable, or supports a reasonable inference supporting a material fact."). Diaz is not entitled to relief.

## Testimony of Detective Leporace

Diaz claims that this Court erred and/or abused its discretion when it overruled his objection to the testimony of Detective Leporace. He argued that Detective Leporace was not permitted to testify as both a fact witnesses regarding voice analysis and an expert in the area of drug and narcotics law enforcement. N.T. at 341.

The Rules of Evidence do not preclude a single witness from testifying, or offering opinions, in the capacity as both a lay and an expert witness on matters that may embrace the ultimate issues to be decided by the fact-finder. Pa.R.E. 702 permits an expert to testify to scientific, technical or other specialized knowledge beyond that possessed by a layperson. Pa.R.E. 701 permits a layperson to testify in the form of an opinion, however, such testimony must be rationally based on that witness' perceptions. Thus, an expert must have additional specialized knowledge in rendering an opinion; whereas, a lay witness must form an opinion based on his or her rationally based perceptions. The Rules, however, do not specifically delineate that a witness must be only one or the other. Instead, the witness' association to the evidence controls the scope of admissible evidence that he or she may offer. Furthermore, Pa.R.E. 704 clearly permits both expert and lay opinion testimony on issues that ultimately must be decided by the trier of fact; in this case, the jury.

*Commonwealth v. Clemat*, 218 A.3d 944, 955-956 (Pa. Super. 2019) (citation and alterations omitted).

29

In this case, Detective Leporace was qualified and provided testimony as an expert in the area of drug and narcotics law enforcement. N.T. at 340, 342. As an expert, he testified that, in his opinion, the 735 Washington Street address was a small to midlevel processing center used to break down bulk amounts of drugs into street and midlevel quantities and as a possible stash location. *Id.* at 343-349. He also described the wiretap investigation into this drug organization and the steps taken to identify Diaz as a participant. *Id.* at 350-363. Detective Leporace testified that he listened to samples of Diaz's voice and was able to identify his voice on phone calls intercepted during the investigation. *Id.* at 359-360. Although he performed a dual function of both expert and lay witness, "[t[he Rules of Evidence do not preclude a single witness from testifying, or offering opinions, in the capacity as both a lay and an expert witness on matters that may embrace the ultimate issues to be decided by the fact-finder." *Clemat, supra.* Therefore, Detective Leporace was permitted to testify as both an expert and lay witness. Diaz is not entitled to relief.

## Diaz's Sentence

Diaz claims that this Court erred and/or abused its discretion when sentencing Diaz. Diaz alleges that his sentence is manifestly excessive and unreasonable, this Court failed to consider mitigating circumstances, this Court failed to balance the sentencing factors and failed to adequately justify its sentence.

"When imposing a sentence, the sentencing court must consider the factors set out in 42 Pa.C.S. § 9721(b), that is, the protection of the public, gravity of offense in relation to impact on victim and community, and rehabilitative needs of the defendant. And, of course, the court must consider the sentencing guidelines." *Commonwealth v. Caldwell*, 117 A.3d 763, 768 (Pa. Super. 2015) (alterations and citation omitted).

30

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision. *Commonwealth v. Fullin*, 892 A.2d 843, 847 (Pa. Super. 2006) (citation omitted).

"There is no absolute right to appeal when challenging the discretionary aspect of a sentence. Rather, an appeal is permitted only after this Court determines that there is a substantial question that the sentence was not appropriate under the sentencing code." *Commonwealth v. Dodge*, 77 A.3d 1263, 1268 (Pa. Super. 2013) (alterations, quotation marks and citations omitted). "An appellant making an excessiveness claim raises a substantial question when he sufficiently articulates the manner in which the sentence violates either a specific provision of the sentencing scheme set forth in the Sentencing Code or a particular fundamental norm underlying the sentencing process." *Commonwealth v. Raven*, 97 A.3d 1244, 1253 (Pa. Super. 2014) (citation and quotation marks omitted).

A sentencing court has "discretion to impose its sentence concurrently or consecutively to other sentences being imposed at the same time or to sentences already imposed." *Commonwealth v. Pass*, 914 A.2d 442, 446-447 (Pa. Super. 2006) (citation omitted). "Any challenge to the exercise of this discretion ordinarily does not raise a substantial question." *Id.* A defendant should not be given a volume discount for his crimes by having them all run concurrently. *Commonwealth v. Hoag*, 665 A.2d 1212, 1214 (Pa. Super. 1995). However, "a sentence can be so manifestly excessive in extreme circumstances that it may create a substantial

31

question." *Commonwealth v. Zirkle*, 107 A.3d 127, 133 (Pa. Super. 2014) (citation omitted). A substantial question is raised when the decision to impose a consecutive sentence "raises the aggregate sentence to, what appears upon its face to be, an excessive level in light of the criminal conduct in this case." *Id.* at 133-134.

The appellate court shall vacate the sentence and remand the case to the sentencing court with instructions if it finds:

(1) the sentencing court purported to sentence within the sentencing guidelines but applied the guidelines erroneously;

(2) the sentencing court sentenced within the sentencing guidelines but the case involves circumstances where the application of the guidelines would be clearly unreasonable; or

(3) the sentencing court sentenced outside the sentencing guidelines and the sentence is unreasonable.

In all other cases the appellate court shall affirm the sentence imposed by the sentencing court.

42 Pa.C.S.A. §9781(c).

A trial court's standard-range sentence will only be reversed "if the sentence is clearly unreasonable when viewed in light of the four statutory factors outlined in 42 Pa.C.S. §9781(d)." *Commonwealth v. Corley*, 31 A.3d 293, 298 (Pa. Super. 2011) (citations omitted). Specifically, the appellate court evaluates (1) [t]he nature and circumstances of the offense and the history and characteristics of the defendant; (2) [t]he opportunity of the sentencing court to observe the defendant, including any presentence investigation; (3) [t]he findings upon which the sentence was based; [and] (4) [t]he guidelines promulgated by the commission. 42 Pa.C.S. §9781(d).

32

When imposing a sentence, a court is required to consider the particular circumstances of the offense and the character of the defendant. In particular, the court should refer to the defendant's prior criminal record, his age, personal characteristics and his potential for rehabilitation.

*Commonwealth v. Griffin*, 65 A.3d 932, 937-938 (Pa. Super. 2013) (quotation marks and citations omitted).

In this case, Diaz argues that there were a number of factors that support his contention that his sentence was excessive. Each one of those claims is addressed below.

Diaz first argues that this Court erred and/or abused its discretion when it failed to consider the mitigating factors present in this case. Specifically, he claims that this Court did not consider his remorse or that he had children. However, the Pennsylvania Superior Court has held that "an allegation that a sentencing court failed to consider or did not adequately consider certain mitigating factors does not raise a substantial question that the sentence was inappropriate." *Commonwealth v. Pacheco*, 227 A.3d 358, 375 (Pa. Super. 2020). Therefore, Diaz's claim that this Court failed to consider his remorse or that he had children does not provide a basis for appellate review of his sentence.

Diaz next claims that this Court erred and/or abused its discretion by failing to consider Diaz's rehabilitative needs or otherwise consider the sentencing standards listed in 42 Pa.C.S.A. §9721. During sentencing, this Court stated as follows:

THE COURT: All right. All right. In fashioning my sentence I have considered the sentencing factors as I'm required to do under Title [42], Section 9721, subsection B;

33

I have specifically considered the protection of the public, the nature of the offense;

I've considered the large quantity of drugs that was put out onto our streets over a considerable period of time;

I've considered the Commonwealth's arguments;

I've considered the statement by Mr. Diaz and by his defense counsel;

I've considered the risk of recidivism. I believe that the defendant has been given multiple opportunities. In 2008 he was convicted of possession with the intent to deliver, he received a sentence of 8 to 48 months. According to my calculations, he would have still been under supervision when he received the next possession with intent to deliver in 2010 of which he received another sentence of 27 to 54 months. He currently has, I believe, a charge in another county that he's serving a sentence on. So I believe that at the age of 39 years he has already been given multiple opportunities to change and has not;

I've considered the gravity of the offense as it relates on the impact in the life of our community. Our community is in a crisis of drugs that are being put out on our street and what is happening to individuals who are using those drugs. When I consider the harm to the victim, I consider the harm to the community. I consider the large amount of cocaine that was being delivered and the large

34

amount of meth that was being delivered in bulk that could have been broken down into thousands of packets delivered out onto the street;

I've considered the rehabilitative needs of the defendant;

I've considered his prior criminal record. He has [a prior record] score of 5. He's 39 years of age;

I've considered his potential for rehabilitation;

I've considered his, what I would consider a lack of remorse for what he did;

I've considered the nature of the offense. As I indicated, this is a large amount of drugs. This was a large organization involving multiple people throughout the County;

I've considered the guidelines in my sentence. There are no factors in favor of probation as the guidelines. There is nothing within the guidelines that would favor probation under Title 42, Section 9722;

I've considered the basis for total confinement under Title 42, Section 9725, and I believe that total confinement is appropriate. I think that any lesser sentence is going to depreciate the seriousness of this crime.

Notes of Testimony, Sentencing Hearing, June 8, 2018 ("N.T.S.") at 11-13.

Diaz's claim is directly contradicted by the record. This Court considered his rehabilitative needs as well as the sentencing factors contained in 42 Pa.C.S.A. §9721(b). He is not entitled to relief.

Diaz next argues that this Court erred and/or abused its discretion when it failed to consider Diaz's rehabilitative needs by failing to elicit potential needs or adequately explain how it had weighed his rehabilitative needs. He further claims that this Court failed to explain how his needs would be best served by this sentence when his actual needs were for further education, job training and career services. However, this Court was under no obligation to do so. The Pennsylvania Superior Court has held that "a sentencing judge may satisfy requirement of disclosure on the record of his [or her] reasons for imposition of a particular sentence without providing a detailed, highly technical statement." *Commonwealth v. Hunzer*, 868 A.2d 498, 514 (Pa. Super. 2005) (citation omitted). As set forth above, this Court considered Diaz's rehabilitative needs during sentencing. This Court also notes that Diaz had the opportunity to make a statement and failed to inform this Court of any specific rehabilitative need he sought to have addressed. Diaz's dissatisfaction with quality of this Court's statement or a lack of inquiry into all of his specific needs does not entitle him to relief.

Diaz next argues that this Court erred and/or abused its discretion by sentencing Diaz to consecutive sentences amounting to a life sentence without adequate reasons.

In *Commonwealth v. Bradley*, 237 A.3d 1131 (Pa. Super. 2020), the appellant entered a guilty plea to various theft offenses and argued that his sentence of 17 to 34 years constituted a *de facto* life sentence. *Bradley, supra* at 1139. He claimed that he would be 81 years old when he was finished his maximum term which exceeded the life expectancy for men in the United States of 78.5 years. *Id.* at 1140. However, the Superior Court stated that the appellant

36

incorrectly focused on the length of his total term and not the date of his potential release. *Id.* The appellant would be 64 years old on the date he could be released which was 14 years prior to the average life expectancy argued by the appellant. *Id.* Therefore, the appellant's sentence was not a *de facto* life term. *Id.* at 1140-1141.

In this case, Diaz was 39 years old when he was sentenced on June 8, 2018, to serve a cumulative sentence of 18½ years to 50 years. He received credit for the 124 days he previously served. Diaz has the potential to be released as early as 2036 when he will be approximately 57 years old. Similar to the appellant in *Bradley*, Diaz appears to be incorrectly focusing on the total length of his sentence in support of his argument that he received a *de facto* life sentence. However, in accordance with *Bradley*, Diaz is clearly not serving such a sentence as he has the potential to be released at the age of 57 which is 21 years prior to the average life expectancy in the United States of 78.7 years. Center for Disease Control, National Center for Health Statistics, available at https://www.cdc.gov/nchs/fastats/life-expectancy.htm (life expectancy in the United States is 78.7 years) (last visited on May 14, 2021).

Diaz also claims that there were inadequate reasons placed on the record to justify consecutive sentences. At sentencing, this Court exercised its discretion and imposed consecutive sentences on Diaz. As set forth above, a challenge to the exercise of this discretion does not ordinarily raise a substantial question unless the aggregate sentence appears to be excessive in light of the criminal conduct. In this case, Diaz was involved in an illegal enterprise that distributed large amounts of controlled substances throughout Berks County. The sentence was not excessive in light of his criminal conduct. Contrary to Diaz's assertion, he did not receive a life sentence for these offenses. This Court included numerous reasons on the record in support of Diaz's sentence. He is not entitled to relief.

37

Regarding Diaz's claim that this Court abused its discretion by focusing solely on Diaz's criminal record and nature of his criminal offenses during sentencing, the record contradicts his assertion. This Court specifically stated at sentencing that it was considering the sentencing factors as set forth in 42 Pa.C.S.A. §9721(b). N.T.S. at 11. In addition to Diaz's criminal record and the offenses in this case, this Court considered, *inter alia*, the protection of the public, the statements of Diaz and the attorneys, Diaz's risk of recidivism, the gravity of the offense as it relates to the impact on the community and Diaz's rehabilitative needs. N.T.S. at 11-12. Therefore, Diaz is not entitled to relief.

Diaz next claims that this Court erred and/or abused its discretion by imposing an unreasonable sentence, a violation of due process and the Sentencing Code. He alleges that this Court unreasonably applied the statutory maximum when sentencing Diaz.

In this case, Diaz was convicted of two counts of corrupt organizations, one count of criminal use of communication facility, two counts of conspiracy to commit delivery of a controlled substance and six counts of delivery of a controlled substance. Diaz had a prior record score of 5. N.T.S. at 2. On the corrupt organizations counts, the offense gravity score was 8 on both offenses with a standard range of 27 to 33 months, plus or minus 9 months. *Id.* at 2. Diaz was sentenced to serve a standard range sentence of 27 to 54 months on each charge. *Id.* at 14. On the count of criminal use of communication facility, the offense gravity score was 5 with a standard range of 12 to 18 months, plus or minus 3 months. *Id.* at 2. Diaz was sentenced to serve a standard range sentence of 12 months to 24 months on that offense. *Id.* at 14. On the count of conspiracy to commit delivery of methamphetamine, the offense gravity score was 11 with a standard range of 72 to 90 months, plus or minus 12 months. *Id.* at 2. Diaz was sentenced to serve a mitigated range sentence of 60 months to 120 months on that offense. *Id.* at 13. On

38

the count of conspiracy to commit delivery of cocaine, the offense gravity score was 10 with a standard range of 60 to 72 months, plus or minus 12 months. *Id.* at 3. Diaz was sentenced to serve a standard range sentence of 60 months to 120 months on that offense. *Id.* at 14. On the 4 counts of delivery of cocaine, the offense gravity score was 10 with a standard range of 60 to 72 months, plus or minus 12 months. *Id.* at 3. Diaz was sentenced to serve a standard range sentence of 72 months to 20 years on each of the 4 counts. *Id.* at 14-15. On the 2 counts of delivery of methamphetamine, the offense gravity score was 11 with a standard range of 72 to 90 months, plus or minus 12 months. *Id.* at 3. Diaz was sentenced to serve a standard range sentence of 90 months to 30 years on both counts. *Id.* at 15-16. Diaz's aggregate sentence was 18 ½ to 50 years.

Pursuant to 42 Pa.C.S.A. §9781(c), this Court's standard range sentences imposed on Diaz will only be vacated if the application of the guidelines was clearly unreasonable. 42 Pa.C.S.A. §9781(c)(2). In making that determination, an appellate court will review the factors outlined in 42 Pa.C.S.A. §9781(d).

The first factor, the nature and circumstances of the offense and the history and characteristics of the defendant, support a finding that the standard range sentence was clearly reasonable. The evidence established that Diaz was involved in the large-scale distribution of narcotics within Berks County. He was working with other individuals in this illegal enterprise. Diaz had two prior convictions for possession with intent to deliver, possession of a small amount of marijuana and a charge of driving under the influence. N.T.S. at 3-7. This Court also had the opportunity to learn about Diaz's characteristics during the course of both the trial and sentencing hearing.

39

Regarding the second factor, this Court had ample opportunity to observe Diaz during the trial and sentencing hearing. This Court observed Diaz's personality, demeanor and conduct during his trial and sentencing. This factor also supports a finding of clear reasonableness.

The third and fourth factors, the findings upon which the sentence was based and the guidelines, also support a finding that the standard range sentences imposed were clearly reasonable. This Court set forth its findings and reasons for imposing standard range sentences on Diaz and incorporates them by reference herein. Additionally, this Court was aware of and considered the guidelines when imposing the sentence.

Based on the above analysis, Diaz's standard range sentences were clearly reasonable under the circumstances. Although Diaz cites *Commonwealth v. Coulverson*, 34 A.3d 135 (Pa. Super. 2011), in support of his argument, this case is distinguishable. In *Coulverson*, the trial court sentenced the defendant to serve 18 to 90 years of incarceration for rape and burglary. *Coulverson, supra* at 138. Here, Diaz was sentenced to serve 18 ½ to 50 years for his involvement in the mass distribution of narcotics. Second, the defendant in *Coulverson* had no prior record and cooperated with the police. *Id.* at 140, 143. Here, Diaz had a prior record score of 5 which consisted of, *inter alia*, two prior charges for possessing controlled substances with intent to deliver. There was no indication that Diaz was cooperative with law enforcement. Lastly, the trial court in *Coulverson* only considered the victim impact and acted on its impulse to obtain retribution for the victim when imposing its sentence. *Id.* at 148. Here, this Court set forth numerous factors and justifications for the imposition of its sentence. Therefore, Diaz is not entitled to relief pursuant to *Coulverson*.

40

## Testimony of Michael Mullen

Diaz next claims that this Court erred and/or abused its discretion when it overruled Diaz's objections to the testimony of Michael Mullen. At trial, the Commonwealth sought to call Michael Mullen, Jr. ("Mullen"), of the Berks County Prison System to testify regarding Diaz's prison intake sheet. N.T. at 283. The intake sheet listed a phone number for Diaz as 484-599-0187. *Id.* at 285, 400. The Commonwealth intended to call Mullen to testify that Diaz would have provided this number to the prison at his intake. *Id.* at 283, 286, 400. Diaz objected to the admission of the intake sheet and to Mullen's testimony regarding that intake sheet due to lack of notice of a witness and a discovery violation. *Id.* at 284, 399. In response, the Commonwealth stated that they were not previously in possession of the intake sheet and were not aware that it was relevant until Diaz raised the issue at trial. *Id.* at 285. The discussion of Mullen's testimony and the production of the intake sheet occurred a day prior to Mullen actually being called to testify. *Id.* at 287.

Rule 573 of the Pennsylvania Rules of Criminal Procedure sets forth the items that must be provided by the Commonwealth in discovery. The Rule states, in relevant part, as follows:

Rule 573. Pretrial Discovery and Inspection

. . .

(B) Disclosure by the Commonwealth.

(1) *Mandatory.* In all court cases, on request by the defendant, and subject to any protective order which the Commonwealth might obtain under this rule, the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case. The Commonwealth

shall, when applicable, permit the defendant's attorney to inspect and copy or photograph such items.

(a) Any evidence favorable to the accused that is material either to guilt or to punishment, and is within the possession or control of the attorney for the Commonwealth;

(b) any written confession or inculpatory statement, or the substance of any oral confession or inculpatory statement, and the identity of the person to whom the confession or inculpatory statement was made that is in the possession or control of the attorney for the Commonwealth;

(c) the defendant's prior criminal record;

(d) the circumstances and results of any identification of the defendant by voice, photograph, or in-person identification;

(e) any results or reports of scientific tests, expert opinions, and written or recorded reports of polygraph examinations or other physical or mental examinations of the defendant that are within the possession or control of the attorney for the Commonwealth;

(f) any tangible objects, including documents, photographs, fingerprints, or other tangible evidence; and

(g) the transcripts and recordings of any electronic surveillance, and the authority by which the said transcripts and recordings were obtained.

Pa.R.Crim.P. 573(B)(1).

In *Commonwealth v. Sullivan*, 820 A.2d 795 (Pa. Super. 2003), the defendant was convicted after a trial by jury of voluntary manslaughter. *Sullivan*, 820 A.2d at 798. During the

42

trial, one of the Commonwealth's witnesses testified to a previously undisclosed inculpatory statement made by the defendant. *Id.* at 801. The defendant moved for a mistrial and, during argument on the motion, the Commonwealth stated that they were unaware of the statement until the witness testified. *Id.* The Superior Court held that there was no discovery violation as the Commonwealth had no obligation to provide a statement to the defense that it did not possess. *Id.* at 804.

In the case at bar, the Commonwealth informed this Court that they were not in possession of the intake sheet or aware of its relevance until Diaz disputed his utilization of cell phone number 484-599-0187 during trial. The Pennsylvania Superior Court has held that a "defendant may request and the Commonwealth is required to produce inculpatory evidence that is relevant and within its possession." *Commonwealth v. Dent*, 837 A.2d 571, 585 (Pa. Super. 2003) (citation omitted) (emphasis in original). Since the intake sheet only became relevant at trial and was not previously in the possession of the Commonwealth, the Commonwealth was not required to produce the intake sheet. Therefore, this Court overruled Diaz's objection as there was no discovery violation. Additionally, this Court further notes that Mullen was called to testify on the day following Diaz's objection. Diaz had a full day to prepare for Mullen's testimony. *See Commonwealth v. Smith*, 416 A.2d 494 (Pa. 1980) (new trial not required when Commonwealth failed to disclose witness identity until mid-trial where defendant given time to prepare and no prejudice shown).

### Diaz's Objections to the Commonwealth's Exhibits

Diaz alleges that this Court erred and/or abused its discretion when it overruled his objections to Commonwealth Exhibits 83, 84 and 86. Exhibit 83 was Diaz's arraignment information sheet. Exhibit 84 was Diaz's affidavit of rights. Exhibit 86 was Diaz's intake

sheet/prisoner information report. He claims that the exhibits were inadmissible hearsay and their use constituted a discovery violation due to the Commonwealth's late production of these documents.

Regarding Exhibit 83, Diaz's objection at trial was to this Court's decision to take judicial notice of Diaz's preliminary arraignment sheet as previously addressed in this opinion. Diaz did not raise a claim that this evidence was inadmissible hearsay or that the Commonwealth committed a discovery violation. Therefore, Diaz has waived this issue. *See Commonwealth v. Stoltzfus*, 337 A.2d 873, 881 (Pa. 1975) ("It has long been the rule in this jurisdiction that if the ground upon which an objection is based is specifically stated, all other reasons for its exclusion are waived, and may not be raised post-trial."). Additionally, when the preliminary arraignment form was marked as Exhibit 83, Diaz joined in the motion requesting that this Court take judicial notice of the document. *Id.* at 336. Diaz is not entitled to relief.

Regarding Exhibit 84, Diaz's affidavit of rights, Diaz did not raise any objection to this exhibit during trial and, again, joined with the Commonwealth to request that this Court take judicial notice of the exhibit. N.T. at 336. Diaz has waived this issue. *See* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.").

Regarding Exhibit 86, this Court incorporates by reference its previous discussion regarding the admissibility of Diaz's prison intake sheet.

### Denial of Diaz's Post-Sentence Motion and Supplemental Post-Sentence Motion

Diaz argues that this Court erred and abused its discretion when it denied his post-sentence motions. The issues raised in Diaz's post-sentence motions were all raised in Diaz's concise statement and addressed by this Court within this memorandum opinion. This Court

44

incorporates by reference the discussion contained within this opinion as the justification for denying Diaz's post-sentence motions.

For the foregoing reasons, we respectfully request that Diaz's appeal be DENIED and his sentence AFFIRMED.